JOSEPH S. CRAIG, treasurer of Proprietors of the Center Meeting-house in Farmington, *vs.* INHABITANTS OF FRANKLIN COUNTY.

*Deed—construction of. Pew-owners—rights of, how vindicated.*

In 1802, John Church, by his deed of warranty, in consideration of $100, conveyed certain land, covering the demanded premises, to "David Moors, treasurer of the First Meeting-house Society in the center of Farmington," a voluntary, unincorporated association, "and his successors in said office, for the use of said society so long as it shall be improved for public use," *habendum* "to the said Moors and his successors in said office, to the use of said society to their use and benefit forever." A meeting-house was soon afterwards erected upon a portion of the land, pews sold, and the house occupied for public worship by several denominations for a series of years. In 1822, pursuant to action of the association, several of the original associates, "their associates and assigns," were incorporated into a body politic by the name of "The Proprietors of the Center Meeting-house in Farmington," and the act of incorporation provided "that the land heretofore conveyed to D. Moors, treasurer of said proprietors, and now deceased, ... be and hereby is confirmed to such treasurer as said proprietors shall hereafter choose for the use and benefit of said proprietors, ... and the treasurer, so hereafter to be chosen, shall be, to all intents and purposes, the successor of said Moors." The proprietors organized under their charter, chose John Church, jr., treasurer, confirmed all votes passed prior to incorporation, and, in 1824, erected forty-five pews in the gallery, and sold them, and their treasurer executed deeds thereof to the purchasers. In the same year, by an additional act of the legislature, the proprietors were authorized to make alterations, additions, and improvements of the house and such

Craig *v.* Inhabitants of Franklin County.

improvement of the land " as is designated and intended in the grant thereof." In June, 1839, pursuant to a vote duly recited in the deed, " The Proprietors of the Center Meeting-house in Farmington, by John Church, jr., their treasurer, in consideration of one dollar," executed and delivered unto the inhabitants of the county of Franklin and their successors forever, a deed of quitclaim of the demanded premises, with a covenant of warranty against the " lawful claims and demands of all persons claiming by, through, or under them," "for the purpose of a site for a court-house, for the use of said county, provided the same shall be accepted by the county commissioners as a full equivalent of all claims of said county on any individuals thereof for furnishing a court-house for ten years, reserving the use of said meeting-house for town meetings and meetings of worship in the lower story so long as the same shall remain standing, but with liberty to the county to rebuild, alter, repair, or fit up the same· in a proper manner for holding the courts, and also conditioned that said deed shall be void whenever a court-house is erected on any other site." In February, 1838, John Church quitclaimed to The Proprietors of the Center Meeting-house the land originally granted to Moors, including the site of the old meeting-house, to be " always used for some public building, court-house, town-house, or meeting-house." In 1839, the county took possession, removed most of the pews in the second story, fitted it up for a court-room, and have retained possession thereof and held courts therein ever since. In 1852, the remaining gallery-pews were removed against the objections of the owners, and further repairs made. In 1867, at an annual meeting of the proprietors, the plaintiff was duly chosen treasurer, and certain others trustees, who were instructed by a vote of the proprietors " to take such measures for the defense of" the proprietors' " rights in the Center Meeting-house as they think proper," under which vote the plaintiff, as treasurer, brought this real action to recover possession of the premises claiming the legal title to be in the treasurer as trustee of the proprietors; *Held*, (1) That Moors took a fee-simple conditional in trust for the use and benefit of the original associates and those who might afterwards become members of the association by the purchase or inheritance of pews; (2) That at the decease of Moors, the estate descended to his heirs at law charged with the trust; (3) That the plaintiff, as the successor of John Church, jr., is estopped by the deed of the proprietors, executed by the latter; (4) That the plaintiff, as treasurer, cannot assert a title against the grantee of the proprietors; (5) Whether the legislature could and did by the additional act transfer the legal title from Moors' heirs to the treasurer of the corporation to be chosen, *quœre*; (6) That if such act did operate as such a transfer, it vested both the legal and equitable estate as a use executed in the corporation; (7) That the effect of J. Church's quitclaim deed to the corporation in 1838 was to abrogate the conditions annexed to the original grant so far as they attached to the immediate site of the meeting-house; (8) That the pew-owners did not become tenants in common of the estate on which the house stood, but were entitled to a beneficial interest, and as against the grantees of the corporation could vindicate their rights only in equity; (9) That the county may avail itself of the limitation bar; and (10) That the case exhibits none of the elements of a public charity.

ON REPORT.

WRIT OF ENTRY, dated Nov. 19, 1867. Plea, general issue, with brief statement and a disclaimer as to the lower story of the meeting-house.

The case is sufficiently stated in the opinion.

*S. & J. W. May,* for the plaintiff.

1. That under the original deed from John Church to David Moors, dated July 13, 1802, said Moors took the legal estate of the premises therein described, in trust for the use and purpose therein named, subject only to said Church's contingent right of reversion.

2. That the legal estate in the premises, subject to said contingent right of reversion, passed, by virtue of the act of incorporation, from David Moors through his successors down to the plaintiff as his last successor in the office of treasurer.

3. That the legal estate never reverted to the original grantor or his heirs by reason of any neglect of the proprietors to choose a treasurer during those years in which no records of the transactions of the proprietors are found; for it is a well-settled principle in equity that " a trust shall never fail for want of a trustee." 2 Story's Eq. Jur., § 976.

4. That by the act of incorporation of 1822, neither the proprietors nor their treasurer were authorized to take and hold any other rights, title, or interest in land, except such as were conveyed by the original deed from John Church to David Moors in 1802; hence the proprietors took nothing by the deed of quitclaim from said John Church to them, dated Feb. 7, 1838.

5. That neither the proprietors nor their treasurer were authorized by the act of incorporation, or by law, to convey the premises at all, or to divert them in any way from the purpose named in the original deed; nor could they do so except by authority from the legislature, which they never had. Hence the proprietors conveyed nothing to the county by their deed given by John Church, treasurer, dated June 24, 1839.

6. That if the deeds of 1838 and 1839 were operative to convey any title to or interest in land, the defendants, before they can

claim title by virtue of the deed to them, must show affirmatively that prior to the delivery of their deed, the $200 had been paid to Captain Henry Stewart for the use of John Church's wife, as it was only upon the condition of such payment that John Church authorized the delivery of his deed to the proprietors. The evidence in the case wholly fails to show that said payment was prior to the deed to the county.

7. That the deed from Church to the proprietors, dated Feb. 7, 1838, being only a deed of release and quitclaim, if its delivery was subsequent to the deed from the proprietors to the county, nothing would thereby enure to the county. *Pike* v. *Galvin*, 29 Maine, 183; *Miller* v. *Ewing*, 6 Cush. 40.

8. That if any rights whatever in the premises could have passed to the county by virtue of their deed from the proprietors, of June 24, 1839, the only rights which the county could by possibility have taken were such contingent reversionary rights as the proprietors had then acquired, if any, from John Church, sr., by virtue of his deed to them, dated Feb. 7, 1838; because the legal estate in the premises, which had previously vested in Moors and his successors in the office of treasurer, in trust for the use and purpose named in the original deed, could never be conveyed by a deed executed in the name of "The Proprietors of the Center Meeting-house in Farmington, by John Church, their treasurer;" nor does John Church, treasurer, undertake by said deed to convey the legal estate vested in him as treasurer, nor can said deed by legal construction have any such effect.

9. That no possession of lands under a claim of title based upon a conditional grant, like the deed of June 24, 1839, from the proprietors by John Church, treasurer, to the county, containing conditions and reservations, will work a disseisin, however long-continued. The deed contains reservations, and is conditioned that the grant "shall be void whenever a court-house for the use of said county be erected on any other site." *Parker* v. *Proprietors of Locks and Canals*, 3 Met. 101.

10. That if the defendants and the proprietors have had a joint

or common possession of that part of the demanded premises now claimed by the county, so that neither party has been dispossessed, the seisin still remains in the party who has the true or actual title. *Brimmer* v. *Proprietors of Long Wharf*, 5 Pick. 131. The evidence shows that the proprietors and defendants have both occupied the court-room, each party claiming to do so as matter of right.

*Wm. Cothren*, on same side.

*Robert Goodenow & S. Belcher*, for the defendants.

BARROWS, J. The piece of land demanded in the writ is part of a parcel which was conveyed July 13, 1802, by John Church, with warranty of title, and release of dower by Church's wife, to " David Moors, treasurer of the First Meeting-house Society in the center of Farmington, and his successors in said office, for the use of said society so long as it shall be improved for public use," *habendum*, " to the said David Moors and his successors in said office, to the use of said society to their use and benefit forever." The deed appears to have been made in consideration of $100, the receipt of which is acknowledged, and the property to have been thus conveyed to Moors, as treasurer of a voluntary, unincorporated association, composed of about fifty persons, who, on or about " ye 3d May, 1802," at Farmington, subscribed a paper declaring that they are " desirous to unite and add to the respectability of this town, and are sensible that this end can be attained in no way so well as by building a meeting-house, for public and social worship, near the center of said town," and, accordingly, " do agree to form ourselves into a body politic with a determined resolution to effect the building of said house, and we do severally pledge our honor to abide by the regulations hereunto subjoined to the completion of said meeting-house.". The first of these regulations is as follows :

" 1st. Said meeting-house is to be the exclusive property of said society." Their determined resolution seems to have been crowned with success; a large parcel of land was purchased and conveyed to their treasurer, as above recited, a meeting-house erected, the

pews sold, and the house occupied for public worship more or less by various denominations for quite a long series of years.

After the business connected with the erection of the meeting-house and the sale of the pews was adjusted, the meetings of the association seem to have been very infrequent. But we find a record dated March 1, 1813, of a meeting at which a new treasurer was chosen, and a committee to confer with the town respecting the compensation to be allowed by the town to the proprietors for the use of the house to hold town meetings in. This meeting was twice adjourned for the purpose of petitioning for an act of incorporation, but nothing appears to have been done about it at that time, and no record is found of any meeting of the association from that time until September, 1821. But in 1822 (prior to which time it is agreed that David Moors, who held the legal title to the land in trust for the proprietors, was deceased), an act of incorporation was procured apparently in pursuance of action taken at the meeting of the association in September, 1821, and certain gentlemen, including a considerable number of the original proprietors, "their associates and assigns," were "incorporated into a body politic by the name of The Proprietors of the Center Meeting-house in Farmington." By the second section of the act of incorporation, it was "further enacted that the land heretofore conveyed to David Moors, treasurer of said proprietors, and now deceased, and his successors in that office, on which the meeting-house aforesaid stands, be and hereby is confirmed to such treasurer as said proprietors shall hereafter choose, for the use and benefit of said proprietors, agreeably to the intention of the original grant; and the treasurer, so hereafter to be chosen, shall be to all intents and purposes the successor of said Moors." By the third section, the proprietors were empowered to raise money for the purpose of repairing the meeting-house and a proper improvement of the land, and for other incidental expenses to be assessed "on the several proprietors of pews in said meeting-house, according to the relative value of the respective pews they may own therein as established by said proprietors," and the private property of each proprietor

was charged with the payment of such assessments, " in the same manner as it would be holden to pay State, county, and other taxes."

The proprietors seem to have promptly organized under the act of incorporation, and to have held their first meeting April 24, 1822, when, among other officers, they chose John Church, the son of the original grantor of the lot, their treasurer, and appointed a committee to form a code of by-laws and regulations, and report at a future meeting, and a committee to see what repairs are necessary, and receive proposals for making them and report. At an adjournment, May 4, 1822, they voted to accept the code of by-laws reported by the committee, acted on the report of the committee on repairs, and voted that the assessors should " ascertain, as far as possible, the owners of pews," and sell the pews, then to be erected in the gallery, to the highest bidder. At a further adjournment, on June 15, 1822, they " voted that all votes of said proprietors, prior to their incorporation, be valid," accepted a plan of forty-five pews to be erected in the gallery, and postponed the sale of them at auction previously voted, but authorized the sale by the assessors of one pew on the ground floor held in common, and of the gallery pews at private or public sale, the treasurer to give quitclaim deeds of them. On the 28th of December, in the same year, among other things, they voted to dismiss the second article in the warrant, which was, " to see what method shall be taken to sell the pews in the gallery," but passed a vote to build them, agreeably to the plan before accepted, and have them completed in eighteen months.

This matter of the sale of the gallery pews seems to have been the subject of much discussion and frequent action, as also was the use of the lower floor by the town for town meetings in consideration of stipulated payments.

The forty-five gallery pews were completed at last, and, June 19, 1824, by vote of the corporation, they were offered for sale for a gross sum of two hundred and fifty dollars, and sold in ten shares for that price ($10 on each share in cash, and the balance the fol-

lowing winter with interest), "the several purchasers to receive deeds of said pews from the treasurer when securities are given for the payment." Feb. 10, 1827, they revised their by-laws, providing, among other things, that pews on the lower floor should be estimated at six shares each, and the pews in the gallery at one share each, and one share shall . be entitled to one vote, and the proprietors of twenty pews shall constitute a quorum to do business (changed Aug. 11, 1827, "so as to have thirty pews on the lower floor constitute a quorum to do business, raise money, or to revise the by-laws);" and that "all officers shall be chosen by written ballot, except committees, and be continued in office until others shall be chosen in their room;" that "each pew shall be valued on the lower floor in assessing taxes according to their original purchase as they were bid off, and pews in the gallery according to the appraisal of the committee chosen for that purpose;" and that "upon change of owners of gallery pews, the new proprietor to give written notice and make proof of the fact to the clerk before he shall be allowed to vote in proprietors' meetings;" and the clerk was required to get and keep as complete a list of the proprietors as possible, and transmit a copy to the assessors when a tax was to be assessed.

By an additional act of incorporation, the provisions of the original act as to liability for assessments were "so far altered and amended as that the pews of the proprietors only shall be liable for the payment of moneys assessed," . . . "and shall be considered and taken to be personal property;" and the proprietors were authorized to raise moneys for defraying the expenses of such alterations, additions, or improvements to the house as they might think proper to make, and for such improvement of the land on which it stands, "as is designated and intended in the grant thereof," "provided the proprietors shall accept this additional act within one year, at a legal meeting to be by them called for the purpose." And the proprietors did so accept it at a meeting held for the purpose Jan. 10, 1829. In 1836, it is apparent from the records that the necessity of assessments for repairs had become urgent; a committee was raised to confer with the town or some denomination to see if

they would buy the house. Votes were passed at other meetings in that year to sell the house at auction, and apportion the money among the owners of the pews; to take the house down and sell in lots to suit purchasers, and distribute the proceeds among the proprietors, and to reconsider these votes.

The testimony is, that for some years, about this time, the house was not occupied for religious worship, and doubts were suggested whether the proprietors had not forfeited their rights under the Church deed. But no entry for a breach of the condition appears to have been made. In 1838, the project of making a conveyance to the county began to be agitated, and in June of that year, upon notice of a meeting to hear the report of the committee chosen to confer with the county commissioners, and determine whether such conveyance should be made, the proprietors met and voted "to instruct their treasurer to make and execute a deed of all the claims which they have to the Center Meeting-house and site, together with the common (reserving the ground now fenced out for a burying-ground), to the county of Franklin as a site for the court-house and other county buildings so long as it shall be occupied for that purpose, provided the said buildings shall be erected of brick, and within two years from the date of the deed." A vote somewhat significant of the condition of the property at that time was also passed, authorizing the treasurer "to prosecute any person that shall make depredations on said meeting-house."

The report of the committee chosen to confer with the county commissioners shows that the proposition of the county commissioners was "to locate the court-house on the spot where said meeting-house now stands, provided the proprietors of said house convey their claim to said house and land to said county for the purpose of building a court-house on said site, and to be held by said county so long as it shall be occupied for that purpose, and provided, also, that a site suitable for the erection of a jail should be given to said county." It seems that the county commissioners' proposition contemplated neither payment nor the performance of any act for the benefit of the proprietors, except taking the old meeting-house and

its site off their hands entirely, and the proprietors were disposed at that time to accede to the proposition, reserving only so much as had been fenced off for the burying-ground, and providing only that the erections to be made by the county should be of brick, and made within two years.

Prior to this, on the seventh of February, 1838, John Church, the original grantor, had made a deed of quitclaim to the proprietors of the lot originally granted to David Moors, " containing two acres by estimation, being the land called the common, and including the site of the old meeting-house, but excluding what is now fenced as a burying-ground, which is to remain as such ; and the said common is always to be used as such ; and the site of the meeting-house shall always be used for some public building, court-house, town-house, or meeting-house." This deed purports to be in consideration of $200, and a memorandum by the grantor upon the margin directs that it shall be placed in the hands of his son-in-law as an escrow, to be delivered when the consideration should be paid. It was not placed on record until July 18, 1839.

May 18, 1839, the vote which was passed the preceding year to convey to the county was reconsidered, and at an adjournment of the same meeting, the corporation voted, " that the treasurer of this society be authorized and directed to convey to the county of Franklin all the right, title, and interest which this society has to " (the premises demanded in the present suit), " for the purpose of a site for a court-house for the use of said county, provided the same shall be accepted by the county commissioners of said county as a full equivalent and discharge of all claims of said county on any individuals thereof for furnishing a court-house for ten years, the deed of conveyance to reserve to said society the use of said meeting-house for town meetings and meetings of worship in the lower story, so long as the same shall remain standing, but with liberty to the county to alter, repair, or fit up the same in a proper manner for holding the courts of said county, and also conditioned that said deed to be void whenever a court-house for the use of said county be erected on any other site."

Thereafterwards, June 24, 1839, a conveyance was made (in which the foregoing vote is recited by way of preamble), setting forth " that the Proprietors of the Center Meeting-house in Farmington, by John Church, their treasurer, in pursuance of the foregoing vote, and of one dollar paid by the said inhabitants of the county of Franklin, the receipt, etc., do hereby remise, release, bargain, sell, and convey, and forever quitclaim unto the inhabitants of the said county of Franklin and their successors forever, all their right, title, and interest in and to " (the demanded premises describing them), for the purpose of a site, etc. (here following the language of the vote, except that the word " rebuild " is prefixed to " alter, repair, or fit up " in the " liberty " granted to the county), habendum to the grantees " and their successors forever, in as full and ample a manner, and with the same limitations and restrictions as in and by said vote of said proprietors is set forth." " And said proprietors do covenant . . . that they will warrant and defend the premises to, etc., against the lawful claims and demands of all persons claiming by, through, or under them." " In witness whereof, the said Proprietors of the Center Meeting-house in Farmington, by John Church, their treasurer, have hereunto set," etc. The deed is subscribed " John Church, treasurer," and the acknowledgment purports to have been made by the proprietors, " by John Church, their treasurer." The testimony shows that claiming title to the demanded premises under this deed, the county, by their agents and officers, took possession of them in 1839, fitted up the second story of the meeting-house for a court-room, etc., expending a considerable sum of money in so doing, and removing most of the gallery pews, and that that portion of the house since that time has been used and controlled constantly by the county officers for purposes connected with the business of the county,—the religious, agricultural, and other meetings which were held there being held by permission of the county officers in charge, and exercising absolute authority as to the occupation of the premises.

The keys seem to have been in the possession of the successive clerks of the courts. The courts have been held there regularly

since March, 1840, and when occupied for other purposes, it has been by and with the permission of these officers, acting in this matter under the direction of the county commissioners. Thus the Unitarian Society obtained access by an arrangement with the county officers, under which rent was paid for a year or more, and there is no evidence from which we can infer that they have not at all times exercised exclusive and absolute authority as to the use of the demanded premises, claiming it as a right. In 1852, further alterations and repairs were made, and the remaining pews in the gallery were removed, notwithstanding the objection of one of the pew-holders, who forbade the mechanic engaged in the work; but he, under the direction of the county commissioners, proceeded and finished it. The county has expended some $2000 in alterations and repairs since their occupation of the premises commenced. The proprietors have had undisturbed possession of the lower floor,— have rented it to the town for town meetings, and it has been used under them for other purposes. Propositions have been mooted from time to time in the proprietors' meetings, looking to the remuneration of the pew-holders whose property in the gallery had been interfered with by the alteration and appropriation of the upper part of the building to the use of the county. But nothing was done, the corporation voting " that any individuals who have had their property in said house injured by the direction of the county commissioners, call on the county for damages." Finally, under a vote passed Sept. 9, 1867, at an annual meeting (where the plaintiff was chosen treasurer, and certain other gentlemen assessors and trustees of the corporation), authorizing the trustees " to take such measures for the defense of our rights in the Center Meeting-house as they think proper," this suit is commenced, wherein the plaintiff, as treasurer of the corporation, claims that the legal title to the premises conveyed by his predecessor, John Church, to the county in 1839, is still in him as trustee for the corporation, by virtue of the original conveyance of John Church, sr., to David Moors in 1802, the act of incorporation of 1822, and his election as treasurer. He denies the validity of the conveyance

to the county by his predecessor. He denies, also, that the county have acquired any rights by the long-continued possession which they have had under this conveyance, and claims that the foregoing facts establish his seisin within twenty years last past, and a right to recover them as against the defendants.

His positions briefly stated are, that David Moors took an estate in trust for those who might become pew-holders in the house; that by, virtue of the act of incorporation, the same estate was transferred to such treasurer as the corporation might choose, and so came to John Church, jr.; that nothing passed to the county by virtue of John Church, jr.'s, deed, because it purports to be the conveyance of the proprietors who were merely the *cestuis que trust*, and not the holders of the legal title; that the legal title still remained in John Church, jr., as treasurer and trustee, and so came to this plaintiff upon his election as treasurer; that whatever had been the form of that conveyance, nothing could have passed by it, because neither the act of incorporation, nor any other statute, authorized the sale of the property, but only the holding of it in trust for the uses specified in the original conveyance from John Church, sr., to David Moors; that the vote of the corporation to sell, and the conveyance made in pursuance of it, could not deprive the individual pew-holders of their rights; that this is a public charity, or, at all events, a trust, and that, therefore, the county could acquire no title by adverse possession; that the county claim under their deed, which is but a conditional one, and that this is incompatible with the acquisition of a title by disseisin; that the county took their deed with notice of the trust, and therefore subject to it, and that thus the title of the defendants, both by deed and disseisin, fails altogether.

Having referred frequently to the records offered in evidence, it is proper to remark here, that though they are not in book form, and there is no evidence that the clerk was sworn during many of the years, yet it is clearly proved that they came from a trunk which has been handed down from one clerk to another, and in which these files were carefully labelled and preserved; many of

the papers are shown conclusively to be original documents, and none exhibit any suspicious appearance.

Both parties in turn resort to these files for evidence upon which they rely, while each objects to the use the other proposes to make of them for the same purpose, yet neither suggests so much as a doubt of their genuineness as minutes made contemporaneously, designed to serve as a record of actual transactions, or of their general accuracy. Under these circumstances, ancient as most of these records are, and inasmuch as the acts and doings of the unincorporated association were formally adopted and ratified as valid and binding by the corporation, we think neither party can complain of their admission as competent evidence of the acts and facts therein recited.

We think David Moors took a fee-simple conditional in trust for the use and benefit of the original associates, and those who might afterwards become members of the association by the purchase or inheritance of the pews.

" When property is conveyed to the use of a party not capable of taking the legal estate, it cannot vest in the *cestui que use* by the statute of uses; therefore, by a well-known rule of construction early engrafted on the statute of Hen. 8, it constitutes an estate in trust in the first takers." *Attorney-general* v. *Proprietors of Federal St. Meeting-house*, 3 Gray, 44.

Here was no body politic or corporate capable of holding the fee which was to be held for the use and benefit not only of the original proprietors and builders of the house, but of those who might in process of time become associated with them as pew-owners, who, by the acquisition of a title to their pews, would not become tenants in common of the estate on which the house stood, but would be entitled, nevertheless, to a beneficial interest and an exclusive right to occupy the particular portion of the house belonging to them under suitable restrictions,—an interest and right capable of protection under and by law, and entitled to such protection when redress for a wrong inflicted is seasonably sought in the proper form.

The deed was to David Moors, as treasurer, and his successors in said office, without words of limitation to heirs or assigns. Moors was not a corporation, and in strictness of law was not capable of having a successor; but the trust upon which he received the property was plainly of such a nature as to be likely to require a legal estate in the trustee for a time exceeding the duration of his natural life, in order to carry the trust properly into effect, and, consequently, under a well-established rule of law, the estate is to be construed as a fee. At his death, it descended to his heirs at law, who then held the legal estate upon the same trust as he had held it. In the absence of any conveyance from them, the demandant claims that the act of incorporation of the proprietors, passed in 1822, operates to vest the legal estate in the treasurer to be chosen by the new corporation and his successors in the office, the title being transferred upon every new election, *ipso facto*, thus making in effect the treasurer a sort of corporation sole, to hold the legal title for the benefit of the corporation aggregate by whom he is elected. It is essential to the maintenance of this action by the demandant to hold that it was competent for the legislature thus to transfer the title, and that the act was so framed as to have that effect. But with the view which we take of the case, it is unnecessary for us to consider whether such an act would be a legitimate exercise of legislative power. But assuming that the legislature could and did, by the act referred to, transfer the legal title from David Moors' heirs to the treasurer to be chosen by the corporation, it was done expressly that he might hold it " for the use and benefit of said proprietors." If we again assume that (notwithstanding there was now a being in existence, capable of holding the legal estate, for whose use the estate was confirmed to the treasurer and his successors), still it was not a use executed by virtue of statute of Henry 8, c. 10, but that the successive treasurers held it in trust for the corporation, the demandant advances just far enough towards the maintenance of his suit to fall within the rule laid down in *Sawyer* v. *Skowhegan*, 57 Maine, 500, which forbids a trustee, to whom the legal title has been conveyed to be held as a naked, pas-

sive trust, to maintain an action against the *cestui que trust*, or those claiming under him to oust them of their possession. In *Sawyer* v. *Skowhegan*, the party who had received a conveyance of the legal title in trust for a lodge of Odd Fellows, undertook to assert that title against the grantee of the lodge, for the benefit of the lodge under a reorganization, but failed for reasons which are equally fatal to the claim of the present plaintiff.

The proprietors of the Center Meeting-house in Farmington, with the utmost deliberation, the subject having been canvassed by them in various aspects more than a year, made a conveyance of all their interest in the property here demanded to the county of Franklin, and warranted the same to the county against all persons claiming by, through, or under them; and this deed was executed in the name of the corporation by the plaintiff's predecessor. We think the successor of John Church, jr., as treasurer, is estopped by that deed from asserting a title for the benefit of those who have warranted all their interest in the premises to the tenants.

Returning now to the act of incorporation under which the plaintiff claims: if it availed to vest the title in the treasurer for the use and benefit of the corporation, it is not easy to see why the estate did not vest in the corporation as a use immediately executed by virtue of the statute of uses (27 Hen. 8, c. 10), the legal estate following the equitable use and interest.

Except when the duties of the trustee are active, no good can result from severing the legal estate from the beneficial use, and it was to avoid the embarrassment of titles thence resulting that the statute of uses was enacted.

There is nothing to indicate that the treasurer was to have any active duties to perform in relation to the estate, or that he was to be anything more than a mere depositary of the title for the use and benefit of the corporation. He was liable to change with annual elections, while the corporation, which was the *cestui que use*, was a permanent organization, capable of holding the legal estate more conveniently for all concerned. If the act of incorporation then operated to transfer the estate from the heirs of the original

trustee, Moors, we think it vested both the legal and equitable estate as a use executed in the corporation which was to have the beneficial interest; and thus, however it may be, the demandants' title would fail.

What was the effect of the quitclaim deed of John Church, sr., to the corporation in 1838? Plainly, we think, for the reasons and upon the principles succinctly and clearly stated by Cutting, J., in *Hooper* v. *Cummings*, 45 Maine, 366, the only effect would be to abrogate the conditions annexed to the original grant so far as they attached to the immediate site of the meeting-house. The original grantor, without ever having entered for a breach of the condition, releases his claim to the estate by another deed to a stranger. What was his claim? A naked right to enter for a forfeiture whenever the condition should be broken,—a right that could be exercised only by him or his heirs,—not by a stranger. The original grantor having alienated this, the condition is gone.

What estate did the proprietors have, then, at the time they made their deed to the county?

That the deed of John Church, sr., made in 1838, and originally delivered to his son-in-law, Stewart, as an escrow, had been at that time perfected by delivery to the grantee on payment of the stipulated sum, we see no reason to doubt. The testimony of Mrs. Samuel Church, we think, is very far from showing that the payment by the proprietors was not made until some time between 1841–43. She says she does not know by whom the money was paid that Mrs. Church, sr., received at that time. If it had been paid by the proprietors and loaned by the widow, and again repaid at the time mentioned by Mrs. S. Church, it would still be likely to be spoken of in the family as the money she received for the deed to the proprietors. Mrs. S. Church's testimony cannot be considered as overcoming, or, indeed, as conflicting with the presumption that the holder of the escrow did his duty in the premises.

Still assuming that the act of 1822 availed to vest the estate in the treasurer for the use and benefit of the corporation as *cestui que use*, and holding that this use was executed in the corporation

immediately upon the vesting of the estate in its treasurer, and that the condition annexed to the original grant was gone by virtue of the deed of John Church, sr., in 1838, the corporation would stand precisely as though it had purchased the estate, and taken an unconditional conveyance of it from John Church as a site for their meeting-house. They would have in themselves the *jus habendi* and the *jus disponendi*, subject only to the requirements of law growing out of the character of the property and the use which had been made of it.

Thus situated, they make a deed of a certain portion of the property to the county, covenanting to warrant the premises conveyed to the grantee against all claims by, through, or under them.

How can the demandant, claiming simply as the depositary of the title for their use, seeking to recover the property only that he may hold it for their benefit, expect to prevail? Most certainly he is estopped by the deed executed by his predecessor, under the direction of the corporation. By means of this conveyance to the county the proprietors, while they curtailed the dimensions of their place of worship, secured a sound roof over their meeting-house for more than a quarter of a century without expense to themselves. Justice will not permit them as a corporation to repudiate the contract by which they accomplished it.

Who was injured by this arrangement? Who has lost anything by it who is not estopped to complain? The corporation had built and sold pews in the gallery; they had confirmed the titles to other pews there, originally granted by the proprietors before their incorporation. To their pew-holders the proprietors stood in the relation of trustees. The pew-holders had a beneficial interest in the property of the corporation and certain rights in their pews. Unless otherwise specially provided by statute, pews are real estate. The owners of them are to have appropriate remedies for any violation of their rights in relation to them. How shall those rights be vindicated? The pew-holders are not tenants in common of the property. It is but a qualified title and ownership that they have in their pews. We think that their remedy, when their rights are

invaded by permission of the corporation to which they belong, and to whom they look as their trustees, must be sought in equity in their own names, making that corporation and its grantees parties to the suit, and that this is the only mode in which the appropriate redress can be meted out. Certainly it cannot be done in a suit like this where their rights are confounded with those of the corporation under whose grant the tenants hold, and where judgment for the demandant, if it could be obtained, would enure directly to the benefit of the same corporation.

But in addition to the estoppel by deed which must prove fatal to the demandants' suit, there is other matter shown in defense, which would effectually bar his recovery.

The county took possession of the premises in 1839, claiming to be the owners thereof, subject only to the condition made in the deed of the proprietors to the county,—a condition which has not yet been broken.

The fact that they entered claiming title under the deed, and that they still contend that the deed is valid and operative to give them a good title to the premises, does not preclude them from availing themselves of the limitation bar. They took possession claiming to own the premises, subject only to a liability to forfeit them if ever a court-house for the use of the county should be erected on any other site. They claimed, in all other respects, the absolute ownership. They exercised the rights and did all the acts indicative of ownership. Their possession was open and notorious, exclusive and adverse. They ignored all claims, both of trustees and *cestuis que trust*, within the limits which they claimed. The case is not within the principle of those in which it has been held, that as between trustee and *cestui que trust* the limitation bar does not operate,—that no lapse of time is a bar to a direct trust. There was a clear repudiation of the trust. They were not tenants in common with the corporation, but each occupied in severalty according to the terms of the grant. They removed nearly all the gallery pews in 1839. In disregard of the prohibition of the pew-holders in 1852, they removed the remainder. Whenever the

premises have been occupied for any purpose except those connected with the holding of the courts, it has been by the permission of the officers and agents of the county, who have at all times controlled the keys.

The case exhibits none of the elements of a public charity. As in the case of *The Proprietors of the Meeting-house in Federal Street in Boston*, 3 Gray, 49, "it is entirely wanting in the quality of gift, donation, or gratuity from anybody to anybody."

Purchase, property, settlement of accounts, use by the members and proprietors who became pew-holders, have been the order of proceeding throughout until the conveyance to the county. The general public had no rights there except by courtesy of the proprietors. There was nothing either in the source or use of the proprietary property to indicate a design on the part of any one to establish a public charity. It is unnecessary to determine whether the acceptance by the corporation of the act of 1828, making the pews personal property, would limit to six years the right of the gallery pew-holders to redress. The county have had such a possession of the premises for a period of twenty-seven years prior to the commencement of this action as must be deemed an effectual bar to its maintenance.                    *Judgment for the tenants.*

APPLETON, C. J.; CUTTING, WALTON, and DANFORTH, JJ., concurred.