DELAWARE LAND AND DEVELOPMENT COMPANY, a corporation of the State of Delaware,
Defendant Below, Appellant,

*vs.*

FIRST AND CENTRAL PRESBYTERIAN CHURCH OF WILMINGTON, DELAWARE, INC., a corporation of the State of Delaware,
Complainant Below, Appellee.

*Supreme Court, on Appeal, Jan. 22, 1929.*

414

416

PENNEWILL, C. J., and RICE, HARRINGTON, RICHARDS, and RODNEY, JJ., sitting.

*Clarence A. Southerland and James H. Hughes, Jr.*, for appellant.

*Leonard E. Wales*, for appellee.

HARRINGTON, J., delivering the opinion of the court:

This is a bill for the specific performance of a contract made by the Presbyterian Church, the complainant below, appellee, for the sale of certain real estate to the appellant.

The bill filed raises three questions:

1. Is the Stedham deed of 1737 subject to a condition subsequent, if the property conveyed is no longer used for the purposes specified in it?

2. If such deed is not subject to a condition subsequent, was the property conveyed stamped with a charitable trust for certain specified uses and purposes, clear of which it cannot be sold by the church?

3. Has the church acquired the absolute title to a certain portion of the land claimed by it, by adverse possession?

The deed in question, in substance, provides that the property conveyed shall be used for a meeting house, burying ground and such other good and pious uses as may thereafter seem most fitting and convenient "and to no other use, intent or purpose, whatsoever."

There are, however, no apt words expressly creating a condition subsequent; nor is there any express provision for a forfeiture of the title in case the property conveyed should no longer be used for any of the purposes specified in the deed.

While technical words are, perhaps, more often used, no

particular words are necessary to create a condition subsequent if the intent to create such a condition can be gathered from the whole instrument.

Because it does not approve of forfeitures, conditions subsequent, however, are never favored by a court of equity, and any doubt, whatever, as to their existence will always operate against them. *First Presbyterian Church v. Bailey*, 11 *Del. Ch.* 116, 97 *A.* 583; *Board of Education v. St. Patrick's R. C. Church*, 15 *Del. Ch.* 286, 136 *A.* 833; *Rawson v. Inhabitants, etc., of Uxbridge*, 7 *Allen (Mass.)* 125, 83 *Am. Dec.* 670; *Kilpatrick v. Mayor, etc., of Baltimore*, 81 *Md.* 179, 31 *A.* 805, 27 *L. R. A.* 643, 48 *Am. St. Rep.* 509; *First M. E. Church v. Old Columb., etc., Ground Co.*, 103 *Pa.* 608; *Adams v. First Baptist Church*, 148 *Mich.* 140, 111 *N. W.* 757, 11 *L. R. A. (N. S.)* 509, *etc.*, 12 *Ann. Cas.* 224; 79 *Am. St. Rep.* 753, *etc.*

It is true that a condition subsequent may be more readily implied where it appears from the deed that the whole consideration for the grant is the accomplishment of some particular and specific purpose by the grantor; and where the enjoyment of the estate granted is clearly dependent upon the performance by the grantees of some acts beneficial to such grantor, or his heirs, and the grant is, therefore, not merely for the benefit of the public at large, or some particular class or portion thereof. *First Presby. Church v. Bailey*, 11 *Del. Ch.* 116, 97 *A.* 583; *Kilpatrick v. Ames*, 16 *Gray (Mass.)* 327; *Olcott v. Gabert*, 86 *Tex.* 121, 23 *S. W.* 985; 11 *L. R. A. (N. S.)* 509, *etc.*, *note;* 79 *Am. St. Rep.* 753, *etc.*, *note;* 3 *Ann. Cas.* 38, *note.*

The mere statement in a deed of the purpose for which the property is to be used, is not, however, sufficient to create a condition within this rule. This principle was clearly stated by the Chancellor in *First Presbyterian Church v. Bailey*, 11 *Del. Ch.* 116, 97 *A.* 583, when in quoting from *Rawson v. Inhabitants, etc., of Uxbridge*, 7 *Allen (Mass.)* 125, 83 *Am. Dec.* 670, *supra*, he said:

"We believe there is no authoritative sanction for the doctrine that a deed is to be construed as a grant on a condition subsequent solely for the reason that it contains a clause declaring the purpose for which it is intended the granted premises shall be used, where such purpose will not enure specially to the benefit of the grantor and his assigns, but is in its nature general and

public, and where there are no other words indicating an intent that the grant is to be void if the declared purpose is not fulfilled."

In addition to the statement of the purpose, the deed in question, also, adds "and to no other use, intent or purpose, whatsoever." The use of these words, however, does not affect the application of this rule and convert what would otherwise be an absolute grant into one that is conditional.

As was said in *Brown v. Caldwell*, 23 *W. Va.* 187, 48 *Am. Rep.* 376, "it is not words of exclusion that create a conditional estate, but words importing an intention to create such estate."

See, also, *Adams v. First Baptist Church*, 148 *Mich.* 140, 111 *N. W.* 757, 11 *L. R. A. (N. S.)* 509, 12 *Ann. Cas.* 224; *Faith v. Bowles*, 86 *Md.* 13, 37 *A.* 711, 63 *Am. St. Rep.* 489.

There is nothing in this deed to indicate that the purpose for which the property conveyed was to be used was of any particular and specific benefit to the grantor. There is, however, evidence of an intent to benefit a portion of the public. Further than that, where the particular language used may have been intended to create a trust or a covenant rather than a condition, that construction will always be adopted. *Board of Education v. S. Patrick's Church*, 15 *Del. Ch.* 286, 136 *A.* 833; *Kilpatrick v. Mayor*, 81 *Md.* 179, 31 *A.* 805, 27 *L. R. A.* 643, 48 *Am. St. Rep.* 509; 11 *L. R. A. (N. S.)* 528. See, also, *Episcopal City Mission v. Appleton*, 117 *Mass.* 326.

While the question, as to whether the Stedham deed created a public trust, will be more fully discussed hereafter, as we view it it did not create a condition subsequent and there, therefore, can be no right of entry in any one for the failure to use the property conveyed for the purposes specified in that deed.

It is next contended that if the Stedham deed did not convey title subject to a condition subsequent, it was a conveyance in trust for certain specified charitable uses or purposes forever; and that the church, therefore, could not sell any of the property included in such deed clear of such trust.

Generally speaking, in order to constitute the dedication of property for charitable uses, three things are essential:

1. That it shall be stamped with a trust. *Doan v. Ascension Parish*, 103 *Md.* 662, 64 *A.* 314, 7 *L. R. A. (N. S.)* 1119, 115 *Am.*

St. Rep. 379; State v. Griffith, 2 Del. Ch. 392; Griffith v. State, 2 Del. Ch. 421; 5 R. C. L. 297; 60 Am. St. Rep. 404, note.

2. That such trust shall be for the benefit of the public or of some portion thereof; differing from a private trust, the beneficiaries must, therefore, necessarily be more or less indefinite. New Castle Common v. Megginson, 1 Boyce, 361, 77 A. 565, Ann. Cas. 1914A, 1207; State v. Griffith, 2 Del. Ch. 392; Griffith v. State, 2 Del. Ch. 421; Johnson v. Bowen, 85 N. J. Eq. 76, 82, 95 A. 370; Burbank v. Burbank, 152 Mass. 254, 25 N. E. 427, 9 L. R. A. 748; Attorney General v. Proprietors of Federal St. Meeting House, 3 Gray (Mass.) 1; 5 R. C. L. 293, 294; 11 C. J. 313.

3. That the conveyance shall be a gift, donation or gratuity, or in the nature thereof, and not based on a purchase for an adequate consideration. Doughten v. Vandever, 5 Del. Ch. 51; Attorney Gen. v. Proprietors of Federal St. Meeting House, 3 Gray (Mass.) 1; Magie v. German Evan. Dutch Church, 13 N. J. Eq. 77; Mills v. Davison, 54 N. J. 659, 35 A. 1072, 35 L. R. A. 113, 55 Am. St. Rep. 594; Craig v. Inhabitants of Franklin County, 58 Me. 479; Attorney General v. Heclis, 2 Sim. & Stu. 77, 57 Eng. Rep. 270.

In Attorney General v. Fed. St. Meeting House, 3 Gray (Mass.) 1, supra, the court said that as the deed under consideration was "entirely wanting in the quality of gift, donation or gratuity, from anybody to anybody" it did not create a public charity.

The same language is quoted with approval in Craig v. Inhabitants of Franklin County, 58 Me. 479, supra.

There is a consideration of £3 of the government of New Castle inserted in the Stedham deed, but such a pound only had a value of $2.67 and $8.01 would seem to be an inadequate price for one acre of land in what is now the City of Wilmington, even though it may have been only a small town in the year 1737; our conclusion, therefore, is that the land was not purchased by the church for a valuable consideration but that the deed was in the nature of a gift to the grantees therein mentioned.

By the express terms of the deed, the property conveyed was to be used for a meeting house, burying ground and such other good and pious uses as to the grantees, or their successors,

might, at any time thereafter, seem most fitting and convenient and to no other use, intent or purpose, whatsoever.

The purposes that may lawfully be the objects of charitable trusts are necessarily too various to be enumerated.

Specific cases have, however, been before the courts of this state on various occasions (*State v. Griffith*, 2 *Del. Ch.* 392; *Griffith v. State*, 2 *Del. Ch.* 421; *Doughten v. Vandever*, 5 *Del. Ch.* 51; *New Castle Common v. Megginson*, 1 *Boyce*, 361, 77 *A.* 565, *Ann. Cas.* 1914*A*, 1207; *Roe v. Doe ex dem. Town of Seaford*, 2 *Boyce*, 348, 80 *A.* 250), and it is sufficient to say that a gift of land in trust for religious purposes, including a church site, comes within that class. *Doughten v. Vandever*, 5 *Del. Ch.* 51; *New Castle Common v. Megginson*, 1 *Boyce*, 361, 77 *A.* 565, *Ann. Cas.* 1914*A*, 1207; *Perry on Trusts*, Vol. 2, § 701; 11 *C. J.* 393; 14 *L. R. A.* (*N. S.*) 92, 93, 95. See, also, *Chew v. First Presbyterian Church*, (*D. C.*) 237 *F.* 219, which also involved the construction of the Stedham deed.

This is, also, true of a gift of land to be used for a burying ground in connection with a church, it also being intended for the use of the public or a portion thereof. *Chew v. First Presb. Church*, (*D. C.*) 237 *F.* 219, *supra*.

The next question to be considered is whether the Stedham deed created a trust, or whether it was a grant directly to the Presbyterian Church. The grantees, Chalmers, Hutchinson, etc., were not only described in the first part of that deed as "Trustees of the Presbyterian Church" but while the release for the payment of the consideration of three pounds which immediately preceded the granting clause, also, included the words "& all others, the congregation and members of the said Presbyterian Church and their successors, forever," it likewise released Chalmers and Hutchinson, and their successors, the Trustees, Overseers & Elders of the same church, and their successors, forever.

In addition to receipting for the monetary consideration of three pounds, this clause, also, used the following language:

"As well for and in consideration and to the interest that * * * the lot of land hereafter described * * * may remain and enure unto the said James Chalmers, James Hutchinson, etc., and their successors, the Trustees, Overseers & Elders of the said Presbyterian Church forever, for a meeting house,

burying ground and such other good and pious uses as to the said James Chalmers, James Hutchinson, etc., the Successors, Trustees & Elders of the said Presbyterian Church (by the congregation thereof, and their successors continually forever after to be chosen), or a majority of them shall, at any time, hereafter seem most fitting and convenient."

The granting clause was, also, to Chalmers, Hutchinson, etc., their successors, etc., as aforesaid.

The habendum was to the same persons by the same designation "to the only proper use and behoof" of the same persons, etc., "for the use of a meeting house, burying ground, etc." as hereinabove stated, adding the words "and to no other use, intent or purpose, whatsoever."

Several covenants then followed. The first was a covenant warranting the lands conveyed "unto the said James Chalmers, James Hutchinson, etc., * * * & their successors, the Trustees, Overseers & Elders of the said church for the uses aforesaid against Timothy Stedham, and his heirs, and all persons lawfully claiming under him or them."

The second was to execute on request any other conveyances that might be required for the further and more better assuring the title to the land thereby granted to the said "James Chalmers, James Hutchinson, etc., * * * & their successors, Trustees, Overseers & Elders of the said Presbyterian Church for the uses aforesaid."

In order to constitute a trust, whether charitable or otherwise, there must be a clear intent to separate the beneficial interest from the legal estate. Such an intent is usually expressed in technical language as in *Trustees for Baptist Church v. Laird,* 10 *Del. Ch.* 118, 85 *A.* 1082, but the omission of such language does not prevent the creation of a trust, where the intent to create it, otherwise clearly appears. *Attorney General v. Federal St. Meeting House,* 3 *Gray (Mass.)* 1, 43; *MacKenzie v. Presbytery of Jersey City,* 67 *N. J. Eq.* 652, 61 *A.* 1027, 3 *L. R. A. (N. S.)* 227; *Doan v. Ascension Parish,* 103 *Md.* 662, 64 *A.* 314, 7 *L. R. A. (N. S.)* 1119, 115 *Am. St. Rep.* 379; *Bennett v. Humane Society,* 91 *Md.* 19, 45 *A.* 888; *Hill on Trustees,* § 55; *Lewin on Trusts,* vol. 1, *p.* 14; 14 *L. R. A. (N. S.)* 79; 5 *R. C. L.* 297.

The property conveyed in the Stedham deed was for the use

of Chalmers, Hutchinson, etc., as Trustees, Overseers & Elders of the Presbyterian Church, of what was then known as Willing Town, but for the purpose of a meeting house, burying ground and such other pious uses for that church as the grantees, or their successors might thereafter deem proper, and for no other use, intent or purpose, whatsoever.

It is, therefore, clear that the grantor did not intend Chalmers, Hutchinson, etc., to have the beneficial interest in the land granted. That being true, that he intended to create a trust, also, seems clear. *Chew v. First Presb. Church*, (*D. C.*) 237 *F.* 219.

That a fee simple estate passed to the grantees in this deed, likewise seems clear.

The words "heirs and assigns" are usually essential to pass a fee simple estate to the grantees in a deed, but where the character of the beneficial interest is such that a fee simple estate in the trustees is necessary to support it, a fee will pass, though those words are omitted. *Attorney General v. Federal St. Meeting House*, 3 *Gray* (*Mass.*) 1, 48; *Cleveland v. Hallett*, 6 *Cush.* (Mass.) 406.

It is true that in considering this same deed, the Court of Chancery in *First Presbyterian Church v. Bailey*, 11 *Del. Ch.* 116, 97 *A.* 583, held that the conveyance of the legal title was to the church and not to trustees for it.

While, as will hereafter appear, we agree with the final conclusion reached by the court in that case, we are not impressed with the reasoning on which it was based, or with the force of the distinction made between the Stedham deed and the deeds in *Trustees for Baptist Church v. Laird*, 10 *Del. Ch.* 118, 85 *A.* 1082.

As a matter of fact, the conclusion of the Chancellor seems to have been largely, if not entirely, based on certain language which he evidently thought appeared in either the granting clause or the habendum of the deed; whereas, the language in question only appeared in the receipt clause. He stated that the conveyance was not to certain persons in trust for the society, but to certain named persons "and their successors, the Trustees, Overseers, and Elders and all others, the congregation and members of the Presbyterian Church and their successors, forever."

The insertion of the names of Chalmers, Hutchinson, etc.,

in the first part of the deed, as well as in the granting clause, the habendum, and all other parts of it must have been for some purpose; and the mere fact that the congregation and members were, also, joined in the receipt clause does not in any way detract from the conclusion that a trust was intended. See *Chew v. First Presbyterian Church*, 237 *F.* 219, *supra*.

Whatever may have been the purpose of the act of 1744 (*Volume* 1, *Laws of Delaware, p.* 271) in considering this intent, it must be remembered that a deed directly to an unincorporated religious society by its name would have been clearly void as a deed, because there would have been no grantee capable of taking title. *Stewart v. White*, 128 *Ala.* 202, 30 *So.* 526, 55 *L. R. A.* 211; *Beatty v. Kurtz*, 2 *Pet.* 566, 582, 7 *Ed.* 521; *In re New South Meeting-House*, 13 *Allen* (*Mass.*) 497; *Philadelphia Baptist Association v. Hart*, 4 *Wheat*, 27, 4 *L. Ed.* 499; 34 *Cyc.* 1149; 4 *R. C. L.* 313; 32 *L. R. A.* 626.

Whether, however, the rights of the ultimate beneficiaries in a deed of that character might be enforced in any other, though more indirect manner, need not be considered, See, however, 32 *L. R. A.* 625, note.

While that rule has now been changed by statute in this State (*Chapter* 275, *vol.* 11, *Laws of Delaware*), a deed to trustees for an unincorporated religious society was then good and valid to pass title in trust for the members of such society (*Vandervolgen v. Yates*, 3 *Barb. Ch.* 242; *Guilfoil v. Arthur*, 158 *Ill.* 600, 41 *N. E.* 1009; *Terrett v. Taylor*, 9 *Cranch*, 43, 3 *L. Ed.* 650; *Alden v. St. Peter's Parish*, 158 *Ill.* 631, 42 *N. E.* 392, 30 *L. R. A.* 232; *American Bible Society v. Wetmore*, 17 *Conn.* 181) and the deed in question was evidently intended to take advantage of that rule.

As a matter of fact, where a deed was made to the "use" of an unincorporated religious society, that it would operate as a trust because the use could not execute, was one of the exceptions engrafted on the *Statute of Uses* (27 *H.* 8) at a very early date. *Atty. Gen. v. Federal St. Meeting House*, 3 *Gray* (*Mass.*) 1, 44; *Craig Tr. v. Inhabitants of Franklin*, 58 *Me.* 479; *Earle v. Wood*, 8 *Cush.* (*Mass.*) 430.

The grantor evidently intended the use of the property for the purposes specified in the deed to continue forever, but this

does not affect its validity, as charitable trusts are exceptions to the rule against perpetuities. *State v. Griffith*, 2 *Del. Ch.* 392; *Griffith v. State*, 2 *Del. Ch.* 421.

In the absence of a power of sale in the instrument creating a charitable trust, the property conveyed for such purposes, theoretically at least, is practically inalienable; it usually being of the very essence of a charity that it shall endure forever. *Seif v. Krebs*, 239 *Pa.* 423, 86 *A.* 872; *Bridgeport Public Library v. Burroughs Home*, 85 *Conn.* 309, 82 *A.* 582; *Drury v. Natick*, 10 *Allen (Mass.)* 169; *Lackland v. Walker*, 151 *Mo.* 210, 52 *S. W.* 414; *Gray on Perpetuities*, § 5, 90; 11 *C. J.* 354.

While the facts should always be carefully scrutinized, a court of equity may, however, order the conversion of such property if it appears that such a conversion is essential to properly carry out the purposes of the trust. *Stanley v. Colt*, 5 *Wall.* 119, 18 *L. Ed.* 502; *Atty. Gen. v. South Sea Co.*, 4 *Beav.* 453; *Weeks v. Hobson*, 150 *Mass.* 377, 23 *N. E.* 215, 6 *L. R. A.* 147; *Rolfe, etc., Asylum v. Lefebre*, 69 *N. H.* 238, 45 *A.* 1087; *Trustees for Baptist Church v. Laird*, 10 *Del. Ch.* 118, 85 *A.* 1082; 11 *C. J.* 354.

The legislature, also, has the same right, though as in a conversion by a court of equity, the fund must, ordinarily, at least, be used to carry out the purposes of the original trust. *Norris v. Clymer*, 2 *Pa.* 277; *In re Van Horne*, 18 *R. I.* 389, 28 *A.* 341; *Crawford v. Nies*, 220 *Mass.* 61, 107 *N. E.* 382; *Sohier v. Trinity Church*, 109 *Mass.* 1; *Stanley v. Colt*, 5 *Wall.* 119, 18 *L. Ed.* 502; 10 *Amer. Dig. (Cent.)*, *pp.* 1325, 1326. See, also, *Roe v. Doe ex dem. Town of Seaford*, 2 *Boyce*, 348, 80 *A.* 250. (See *Tharp v. Fleming*, 1 *Houst.* 480.)

The authority of both the court of equity and the legislature is based on its rights as *parens patriæ* in one case originally exercised by the English Court of Chancery by delegation from the King and in the other as succeeding to the original sovereign rights of the King. *Doughten v. Vandever*, 5 *Del. Ch.* 51.

In the Seventeenth Year of the Reign of George II (1744), or about seven years after the execution and delivery of the Stedham deed, the colonial legislature of this State passed an Act relating to religious societies. This act was entitled "An Act for the Enabling Religious Societies of Protestants within this

Government to purchase lands for burying grounds, churches, houses of worship, schools, etc." *Vol.* 1, *Laws of Delaware, p.* 271; *Code of* 1829, *p.* 457.

This Act, among other things, recited that in many cases religious societies of protestants had purchased property used for churches, school houses and burying grounds and had taken title thereto in the names of trustees; that such trustees, or their heirs, had in some cases changed their beliefs and joined other religious societies, professing different faiths, and contrary to the intent of the original deed or gift, had transferred the legal title for the benefit of such other denominations, to the great disquiet and uneasiness of many good people of this government. The Act then ratified and confirmed the rights of the trustees, their heirs and assigns "in trust and not otherwise but for the use of the same religious societies" for whom such lands had been originally purchased. It further provided that every grant or devise by any such trustee, or his heirs, should be for the sole use, benefit and behoof of the said societies who had been in peaceable possession of the same, for seven years before the passage of that Act, or for whose use the same had been originally granted.

The same Act, also, made it lawful for any religious society or congregation of Protestants to purchase or take lands, but only for churches, burying grounds, etc.

In 1787 the legislature passed another act entitled "An Act to enable all the religious denominations in this State to appoint Trustees, who shall be a body corporate for the purpose of taking care of the temporalities of their respective congregations." *Vol.* 2, *Laws of Delaware, p.* 878, *Code of* 1829, *p.* 459.

This act repealed all inconsistent provisions of the previous act.

The English Mortmain Acts were never in force in this country (*State v. Griffith*, 2 *Del. Ch.* 392; *Griffith v. State*, 2 *Del. Ch.* 421) and this act, also, contained certain mortmain restrictions somewhat similar to those appearing in the English Acts and much more specific than the limitations of that character in the preceding act of 1744. It, among other things, further provided that any religious society of christians having a certain membership and entitled to the free exercise of their religion in

this State might become incorporated and might purchase, take or hold real estate "in fee simple or otherwise * * * to and for the use of their respective societies or congregations."

*Section* 5 of this act, also, apparently intending, in part, at least, to remedy the conditions, recited in the previous act, provided that

"All lands * * * given, granted, etc., * * * to any religious society or congregation, or to any person * * * in trust for them, and to their use" before October 20, 1744 "the said congregation, or any person in trust for them, or expressly for their use, having hitherto continued in the peaceable and quiet possession of the same * * * and for the recovery whereof no action or actions hath, or have, been brought * * * shall be, and hereby are declared to be, to and for the use of the same, according to the purport and effect, true intent and meaning of such last will, deed, etc., * * * and for no other use, intent or purpose, whatsoever."

*Section* 7 provided that

"All the estate, right, title, interest, use, possession, property, claim, and demand, whatsoever, of the said societies or congregations respectively, or any person or persons, whatsoever, in trust for them, or for their use, as well in equity as in law, *at the time of passing this present act*, of, in and to, any lands, tenements, hereditaments, etc., shall be and become vested in the said trustees, to be chosen according to the direction of this act, in trust nevertheless, and to and for the use of their societies or congregations respectively."

*Section* 8 further provided that the Trustees of the Society or Congregation "by the name to be taken and recorded as aforesaid" might "give, grant, and demise, assign, sell, and otherwise dispose of" the property of the Society "as to them shall seem meet, for the use and benefit of the Society or Congregation."

From the context of this act as a whole, it appears that vested "in the said Trustees" meant vested in the corporation and that *Section* 7, therefore, provided that all of the right, title and interest of any religious society or congregation in any real estate, or of any person, in trust, for it *at the time that act was passed* should, when such society should become incorporated, vest in the corporation, but in trust and to and for the use of such society or congregation.

The right of a religious corporation, in its discretion, to sell

and convert its property for the benefit of the society was, also, given in broad and general language.

While on incorporation, all the rights of the society vested in the corporation and the corporation could take and hold real estate by direct grant, devise, etc., as the right to incorporate was limited to societies having a membership of, at least, fifteen families, it was not surprising that there was no provision in that act prohibiting deeds in trust for unincorporated religious societies.

As a matter of fact, as we shall hereafter see, this prohibition did not come until many years later, under the Act of 1855. The history of the Delaware acts above referred to is interesting and is discussed in some detail in *State v. Griffith*, 2 *Del. Ch.* 392.

While I find no legislative act making the Church of England the established church in this State, the first of the acts above referred to, at least, seems to have been enacted because the temporal rights of churches, other than that church, had been questioned in various reported cases in England, and for the purpose of protecting such rights beyond any possible question in this State. *State v. Griffith, supra.*

This act was almost identical with the Pennsylvania Act of 1731 (*Purdons' Digest, Vol.* 1, *p.* 271) and only referred to Protestants.

The Act of 1787 was, however, after the Revolution and, therefore, after the rights of all religious societies had been clearly recognized by the Delaware Constitution of 1776.

The will of Benjamin Potter, a former citizen of the Eastern Shore of Virginia, who migrated to Milford, Delaware, where he accumulated a considerable fortune as a merchant and tanner, created one of the early charitable trusts in this State.

In considering this will, the Court of Chancery in *State v. Griffith*, 2 *Del. Ch.* 392, *supra*, expressly stated that these statutes related to charitable uses and trusts for religious purposes and were, in fact, the only statutes in this State relating to charitable trusts of any kind.

With some slight changes in phraseology, most, if not all of the material provisions of the Act of 1787 have been in force in this State ever since that date and have appeared in the *Revised Codes* of 1852, 1893 and 1915. This not only includes all of the

provisions for incorporating religious societies but all of the material provisions of *Sections* 5, 7 and 8 of the original act.

Beginning with the *Code* of 1852 (*Section* 4, *Chapter* 39) and since that date, so far as this case is concerned, at least, the essential provisions of *Sections* 7 and 8 have been combined in one section substantially in its present form. That section (*Section* 2168, *Revised Code* 1915) now provides that "all the estate, right and title which any such society, or congregation, may have in any property real or personal in themselves, or by trustees, or for their use before incorporation, shall upon incorporation become vested in the said corporation, which may grant, demise or dispose thereof."

In connection with the clause automatically vesting the rights of the society in the corporation when created, the words "before incorporation" have been substituted for the words "at the time of passing this present Act," appearing in the original act.

The language of the present section is, therefore, much broader in its application than to rights existing at the time the act of 1787 was passed. This section omits the words appearing in *Section* 7 of the original act, that the rights of the society vesting in the corporation shall be "in trust, nevertheless, and to and for the use of their societies or congregations respectively." It includes, however, the right to sell, included in *Section* 8 of the original act, though it omits the words "for the use and benefit of the society or congregation to which they shall respectively belong."

Since 1852, *Section* 5 of the Act of 1787 (*Section* 2175, *Revised Code* 1915) has provided that all real estate granted by will, deed or other conveyance, to any religious society or congregation, or to anyone in trust for them, or to their use, before October 20, 1744 "shall be for the use of the same, according to the intent of the donor or grantor, and the form and effect of the * * * deed or conveyance" as in the Act of 1787.

It omits, however, the original provision as to the lack of pending suits for the recovery of possession, but adds a proviso that "the said Society or Congregation shall have been for twenty years hitherto in the adverse and quiet possession of the same"

and, therefore, substitutes a definite and specific period of possession for the general clause in the original act.

It is unnecessary, however, for us to consider this provision or whether its original purpose was understood when it was amended, as the only material section seems to be what is now designated as *Section* 2168 of the *Revised Code of* 1915. While having little or no bearing on this case, in giving the history of this statute, perhaps, we should state that it was designated as *Chapter* 39 of the *Revised Code of* 1893, and was repealed, but re-enacted with some slight changes in 1911 by *Chapter* 89, *Volume* 26, *Laws of Delaware*. These changes, however, did not affect any of the sections material to the consideration of this case.

*Chapter* 167 of *Volume* 29 of the *Laws of Delaware* also repealed and supplied *Section* 2174 of the *Code of* 1915. That chapter, in substance, provided that religious corporations might take and hold real and personal property by gift, devise, will, deed, etc., and might alien, mortgage, or otherwise encumber and dispose of the same, at pleasure, unless restricted by the provisions of such gift, devise, will, deed, etc., but it did not in any way limit the effect of *Section* 2168 of the *Revised Code* 1915.

The Presbyterian Church first attempted to incorporate in 1789. The Act of 1787 provided, however, that no religious society could incorporate under its provisions, unless it had a membership of at least fifteen families. *Volume* 2, *Laws of Delaware, p.* 878, *Code of* 1829, *p.* 459.

The certificate of incorporation filed, while complying with the act, in all other particulars, omitted any statement of the church membership; consequently, there is nothing in the record to show that its incorporation at that time was legal. It apparently functioned as a corporate body under this proceeding, however, for more than one hundred years, but whether it could be considered as a corporation *de facto* need not be considered by us, as it was, undoubtedly, legally incorporated in 1906. While it appears from the record that all of the original trustees in the Stedham deed of 1737 had died long before 1906, it does not appear who their heirs were or in whom the legal title was then vested. However, that may be, that title did vest in the corporation, at least by 1906, under the express provisions of what is

now designated as *Section* 2168 of the *Revised Code of* 1915, seems clear. To make it doubly sure that the legal title did vest in the corporation then created, a petition was presented to the Chancellor under *Chapter* 90, *Volume* 11, *Laws of Delaware*, reciting the death of all of the original trustees; that their heirs were unknown and asking that a trustee be appointed to convey the legal title to such corporation. Pursuant to this petition, Andrew C. Gray, Esquire, was appointed trustee and in 1912 executed a deed, which purported to convey to the corporation, by its then corporate name, the legal title originally conveyed to the trustees in the Stedham deed.

While it does not appear in whom the legal title was vested on March 1, 1855, or whether such person or persons were then living or dead, on May 13, 1912, the corporation, also, procured a deed from Charles S. Richards, who was then Secretary of State. This proceeding could only have been taken on the theory that the title might have escheated to the State under the Act of 1855, which will be considered later.

Having discovered that this deed merely covered the Stedham lands a deed for the remainder of the property in the possession of the church was also procured from Charles H. Grantland, who was the Secretary of State in 1928.

As we view it, the omission from what is now designated as *Section* 2168 of the *Revised Code of* 1915, of some of the clarifying language used in the original Act of 1787, was not intended to change the rights of either the corporation or its members. The corporation was still the trustee holding the legal title for the benefit of its members who were the *cestuis que trustent*. It was, also, expressly given the right to sell and convert the corporate property but the fund arising from such sale was treated as a trust fund and could, therefore, only be used for the charitable purposes specified in the original deed, or other conveyance.

From what we have already said, our conclusion, therefore, is that at the time this contract was made, the church corporation had not only acquired title, but under *Section* 2168 of the *Revised Code* 1915 could convey a good and marketable fee simple title to the lands included in the Stedham deed. See *Wilmington Monthly Meeting of Friends v. Ninth Street Co.*, 10 *Del. Ch.* 290, 91 *A.* 542.

In *Chew v. First Presby. Church, (D.C.)* 237 *F.* 219, which also involved the Stedham deed, certain language was used that would seem to be inconsistent with this conclusion as to the effect of *Section* 2168, but that case merely involved the consideration of private rights that had been acquired in the church graveyard while so far as the record shows no such rights are involved in this case.

While unnecessary in order to remove any possible doubt as to the right of the church corporation to sell the property in question, that right was, also, expressly given by a special act of the legislature entitled "An Act to authorize First and Central Presbyterian Church of Wilmington, Delaware, Inc., to convey certain real estate."

This act was approved by the Governor on February 11, 1929, and provided that the proceeds of the sale should be held on the same trusts as were provided in the Stedham deed.

Notwithstanding the conclusion above announced, considering the apparent uncertainty among the members of the bar as to the rights of religious societies, with respect to their property, and its possible effect on this case, the Act of March 1, 1855 (*Chapter* 275, *Volume* 11, *Laws of Delaware*) should be briefly considered by us.

This act provides:

"*Section* 1. That no grant, conveyance, devise or lease of personal or real estate to, nor any trust of such personal or real estate for the benefit of any person and his successor or successors, in any ecclesiastical office, shall vest any estate or interest in said person or his successor; and no such grant, conveyance, demise, or lease to or for any such person by the designation of any such office, shall vest any estate or interest in any successor of such person. But this section shall not be deemed to admit the validity of any such grant, conveyance, devise or lease, heretofore made.

"*Section* 2. That no grant, conveyance, devise or lease of any real estate, dedicated or appropriated, or intended to be dedicated or appropriated to purposes of religious worship for the use of any congregation or society shall vest any right, title or interest in any person or persons to whom such grant, conveyance, devise or lease be made unless such grant, conveyance, devise or lease be made both in form and in fact, to a corporation organized according to the provisions of the laws of this State, as contained and provided in, and by the 39th *Chapter* of the *Revised Code*, under the title of 'Religious Societies'.

"*Section* 3. That any real estate of the description named in second section of this Act, and which has been heretofore granted, devised or demised, to any person or persons in any ecclesiastical office by designation of such office or otherwise, shall be deemed to be held in trust for the benefit of the congregation or society using the same, and shall upon the death of the person or persons in whom the title shall be vested at the time of the passage of this act, vest in the religious corporation formed by the congregation or religious society occupying and enjoying such real estate as aforesaid. Provided, such corporation organized according to the laws of this state, shall be in existence at the time of the decease of the person or persons holding the title thereto.

"*Section* 4. That in the event that such corporation or society shall not be incorporated as aforesaid, then and in that case, the title of such real estate shall escheat to the State of Delaware in the same manner and with the same effect as if the person holding the title thereto had died intestate and without heirs capable of inheriting such real estate."

*Section* 5. Then provides that in case any real estate shall escheat to the State of Delaware, by virtue of *Section* 4 of the act, that the Secretary of State shall convey title to the religious society which had occupied and enjoyed such real estate for the purpose of religious worship if and when it should become incorporated.

*Section* 3 of this act appears in the *Revised Code of* 1915 as *Section* 2183. While the words "on March 1, 1855," at which time the act was passed, are substituted for the words "at the time of the passing of this Act," as originally drawn, that change does not affect the meaning of the section.

This act was considered by the Court of Chancery in *Wilmington Monthly Meeting of Friends v. Ninth Street Co.*, 10 *Del. Ch.* 290, 91 *A.* 542. It appears that a deed for property to be used as a meeting house had been made to lay trustees, for the Friends Society, before 1855. Pursuant to the direction of the Society and the terms of the original deed, the surviving trustee made a deed to new trustees in 1856. The surviving trustee died in 1858 and the Society was not incorporated until 1913. After it had been incorporated, it made a contract to sell its property to the Ninth Street Company.

The main question considered was whether the corporation had title to the property which it had agreed to sell. The Chancellor very properly held that under *Section* 2 of the act (*Section* 2182, *Revised Code* 1915) no title passed under the deed of the

surviving trustee in 1856, as the lands in question had been dedicated or appropriated to purposes of religious worship for the use of the Friends Society and a deed, other than to a corporation, was, therefore, within the prohibition of that section.

He, also, held, however, that on the death of such trustee in 1858, as the society had not then been incorporated, the lands in question had escheated to the State. The society had previously secured a deed from the Secretary of State, so that specific performance of the contract of sale, was decreed, on that ground and that decree was affirmed, though without opinion, by this court.

In reaching this conclusion, the Chancellor held that *Section 3* of the act covered deeds theretofore made to *lay trustees* for unincorporated societies. This conclusion was, apparently, based on the use of the words "or otherwise" in connection with the clause providing that any lands dedicated or appropriated, or intended to be dedicated or appropriated to purposes of religious worship *theretofore* granted or demised to any person or persons "in any ecclesiastical office, by designation of such office, or otherwise" should be deemed to be held in trust, etc.

We agree with the Chancellor's conclusion that the corporation had title, and that it could convey such title, but we are unable to agree with the reasoning on which his decree was based.

The deed to trustees prior to 1855 was not to any person in any ecclesiastical office, and as we view it *Section 3* of the above act, therefore, had no application, whatever, to that case; nor did title escheat to the State under *Section 4*.

On the incorporation of the Friends Society in 1913, the legal title passed from the persons then holding the same, either directly or indirectly, under the surviving trustee, and vested in the corporation, according to the provisions of what is now designated as *Section 2168* of the *Revised Code of 1915* and could, also, be sold and converted under that section.

As a matter of fact, the Chancellor recognized that it was possible that that section might have this effect, but, considering his construction of *Section 3* of the Act of 1855, concluded that it was not necessary to consider its provisions in detail.

This disposes of the rights acquired by the church under the Stedham deed and of the usual general statutory right of a reli-

gious corporation to sell and convert any property owned by it though the conveyance created a charitable trust in so far at least as such right may not be affected by the specific provisions of *Chapter* 167, *Volume* 29, *Laws of Delaware.*

In addition to the lands included in the Stedham deed, the church has, however, contracted to sell certain other lands claimed by it and which have been in its possession a great many years, but to which it, apparently, has no record title.

The lot in question consists of that portion of the church property which is bounded on the South by the lands and building of the Delaware Trust Company, on the North by the lands included in the Stedham deed, having a frontage on Market Street of, approximately, 67 feet and on King Street of, approximately, 37 feet. This lot is composed, in part, of the northern portion of the lands apparently described in the lease of Peter Stalcup to Zachariah Ferris in 1771, the northern boundary of which is the middle of what was then known as the Great Road to the Rocks; and in part of the northern half of what was originally the bed of that road, as the lines in the Stedham deed, apparently, did not run to the middle of such road.

It will be remembered that the Great Road to the Rocks has been closed for upwards of one hundred years, but that it originally crossed Market Street in a general northwesterly and southeasterly direction between what is now Ninth and Tenth Streets of the City of Wilmington. How that road was originally laid out and, therefore, whether when it was closed the northern half of its bed, which was not included in either the Stalcup lease or the Stedham deed, reverted to the State, or to some private individual, does not appear.

The claim of the church to the whole of the lot in question is based on adverse possession.

*Section* 2174, *Revised Code* 1915, as amended by 29 *Del. Laws,* c. 167, provides that "Every such corporation [referring to religious corporations] may take and hold by gift, devise, will, deed or lease, real estate," etc.

It is contended that religious societies can only acquire property in the manner provided by this statute and, therefore, cannot acquire title by adverse possession.

The purposes of the religious statutes in this state have already been pointed out, and while there may be slight changes in the language used in this section and in the language used in the corresponding sections of the Acts of 1744 (*Volume* 1, *Laws of Delaware, Chapter* 108) and 1787 (*Volume* 2, *Laws of Delaware, Chapter* 144) we do not regard these changes as important, so far as this particular question is concerned.

The present statute authorizes religious corporations to take by deed, and the theory upon which title may be acquired by adverse possession is that a grant will be presumed when the possession has been sufficient to justify the application of that rule. *Fletcher v. Fuller*, 120 *U. S.* 534, 7 *S. Ct.* 667, 30 *L. Ed.* 759; *Tiffany on Real Property, Vol.* 2 (*2d Ed.*) *pp.* 1420, 1421.

That a religious corporation in this State may, therefore, acquire rights by adverse possession seems clear. *Harpending v. Reformed Protestant Dutch Church*, 16 *Pet.* 459, 10 *L. Ed.* 1029; *People v. Trinity Church*, 22 *N. Y.* 44; *Camp v. Camp*, 5 *Conn.* 291, 13 *Am. Dec.* 60; *Second Precinct in Rehoboth, etc., v. Carpenter*, 23 *Pick.* (*Mass.*) 131; 34 *Cyc.* 1150.

Even if it be conceded for the sake of argument that the church was not legally incorporated until 1906, it is well established that where land is acquired by the officers of a religious society for its benefit and the society subsequently becomes incorporated, the prior possession of such officers will operate to the benefit of the incorporated society in a claim of title by adverse possession. *Gallupville Reform Church v. Schoolcraft*, 65 *N. Y.* 134.

*Section* 4662 of the *Revised Code of* 1915 provides that "No person shall make an entry into any lands, tenements, or hereditaments, but within twenty years next after his right, or title, to the same, first descended, or accrued."

*Section* 4663 of the same *Code* further provides that "No person shall have, or maintain any writ of right, or action, real, personal, or mixed, for, or make any prescription, or claim, to, or in, any lands, tenements, or hereditaments, of the seisin, or possession of him, his ancestor, or predecessor, and declare, or allege, in any manner whatever, any further seisin of him, his ancestor, or predecessor, but only an actual seisin of him, his

ancestor, or predecessor, of the premises sued for, or claimed, within twenty years next before such writ, or action."

The courts of this State have frequently considered titles acquired by adverse possession and the elements essential thereto. That title can be acquired in that manner, when the possession relied on has been open, notorious, exclusive and held by fixed and definite boundaries, though not necessarily marked by fences; has been held under a claim of right and has, therefore, been hostile to the rights of ownership of all others, and has continued for, at least, twenty years, is settled beyond question. *Inskeep v. Shields*, 4 *Har.* 345; *O'Daniel v. Bakers' Union*, 4 *Houst.* 488; *Tiffany on Real Property*, (2d Ed.) *Vol.* 2, 1917, *etc.*

*Section* 12, *Revised Code* 1915, provides "That a continued, uninterrupted and peaceable possession of any land, other than salt marsh, beach or shore, for twenty years by any person, or by those under whom he claims, shall be a bar to any claim of title in the State to such land, although no patent or grant has been made for the same, and nothing paid to the State therefor."

The record shows that the northern portion of the bed of the Old Road to the Rocks is not salt marsh, beach or shore land and the rules above announced as to what is necessary to constitute adverse possession, therefore, apply to that portion of the lot in question, even if it reverted to the State when the road was closed.

Whether adverse possession will give title against the State has, also, been discussed in the following Delaware cases, (*Tubbs v. Lynch*, 4 *Har.* 521; *Delaney v. Boston*, 2 *Har.* 489; *Walls' Lessee v. McGee*, 4 *Har.* 108) but because of the above statute, it is unnecessary to consider them.

Whether, however, the facts of this case show that the church has acquired title to the lot occupied by it by adverse possession, including the road bed in question, remains to be considered.

This case was heard on bill, answer and affidavits. The church claims that it has had possession of the lands in question under a claim of right since 1799 and has, therefore, long since acquired title by adverse possession.

Where adverse possession is in issue, it is well settled that

the declarations of persons in possession are generally admissible to show the character of such possession. *Wigmore on Evidence, Vol. 3, §§ 1778, 1780; McBride v. Thompson, 8 Ala. 650; Webb v. Richardson, 42 Vt. 465; Owen v. Moxon, 167 Ala. 615, 52 So. 527; Duffey v. Presbyterian Congregation, 48 Pa. 46; Ward v. Cochran, (C. C. A.) 71 F. 127.*

This principle applies whether such declarations are for or against the interest of a person claiming to be an adverse owner. *Wigmore on Evidence, Vol. 3, § 1778; Greenleaf on Evidence, § 189; Keener v. Kauffman, 16 Md. 296.*

Such declarations merely compose a part of the *res gestæ,* however, and are not admitted for the purpose of showing the truth of the assertions made.

The records of the church have apparently been regularly kept by its officers from a very early date and constitute declarations by it. Among other evidence, such entries are strongly relied on by the church to show adverse possession.

It appears from such records that the church in 1792 claimed that Mr. Ferris, prior to that time, had encroached "on the ground belonging to the said congregation by erecting a house and enclosing and keeping possession of the same" and directed that an action of ejectment for the recovery of such property be brought against him.

The records of the Court of Common Pleas for New Castle County, also, show that an action of ejectment was brought by the church against John Rea in 1799, though whether he was the tenant of Mr. Ferris does not appear.

According to the church records, the line between Mr. Ferris and the church was established by mutual agreement some time prior to August 3, 1799, and on that date the church passed a resolution directing that the wall on the southerly side of its graveyard be taken down and erected on the agreed line.

It, also, appears from such records that John Ferris on May 20, 1815, presented an account against the church for "a frame house now on the premises of the said congregation" for which he agreed to accept and the church agreed to pay in certain specified installments the sum of $450.00 with interest; $150 of which was to be paid in cash and on that date a receipt for the payment

of that amount was, apparently, written on the face of the church record and there is evidence to the effect that such receipt was signed by John Ferris in his own handwriting.

There is no specific proof that the house in question was the same house referred to in the minutes of 1792, but as John Ferris was the residuary legatee and devisee under the will of his father, Zachariah Ferris, and there is nothing to show that any other house was in controversy, perhaps we may assume that this record referred to the same house.

Zachariah Ferris, by his will dated September, 1800, and proved January 31, 1803, devised twenty feet of the Stalcup land "to be divided off the Northeast side of my lot and next adjoining to the Presbyterian Congregation's land" to his two granddaughters.

In 1804 these devisees deeded the same land by the same general description to John Ferris and the deed described the property conveyed as adjoining lands in the possession of the church.

Zachariah Ferris never had anything more than a leasehold interest in the Stalcup lands and John Ferris acquired no greater interest from him and his devisees, but in 1813 and 1814 he acquired all of the reversionary rights of the devisees of Peter Stalcup and in 1815 was the record owner of the fee simple title to such lands.

Any claimants against the rights of the church for any portion of the Stalcup lands would have to claim in part under Zachariah Ferris, as well as John Ferris; any admissions against interest by either of these persons, while in possession would, therefore, be within the rules above announced and important to the consideration of this case. The same is true as to other owners in the chain of title.

The Stedham lands did not run to the middle of the Old Road to the Rocks. The will of Zachariah Ferris would, therefore, seem to admit ownership by the church of some of the Stalcup lands but what part of such lands does not appear. The same may be said as to the admission of possession by the church in the Woodbridge and Hollingsworth deed to John Ferris in 1804.

Up to this time, governed by the rules above announced, however, there is nothing to show possession of any specified

property by the church, so the record entries of 1792, 1799 and 1815 would not seem to be sufficient or even competent evidence to show adverse possession by the church beginning in 1799, as is alleged in the bill. *Wigmore on Evidence*, § 1778.

In 1818, however, the lot devised by Zachariah Ferris to his grand-daughters, with other Stalcup lands adjoining it, on the south, was conveyed by John Ferris by a particular and specific description by dimensions and boundaries to Margaret Donaldson.

That deed conveyed what is now the Delaware Trust Company property and located the possession of the church practically in accordance with its present claims, so far as the Stalcup lands are concerned.

Further than that, the church record covering the period beginning October, 1838, and ending July 9, 1867, also, contained what purports to be a copy of the agreement specifically establishing the line between Mr. Ferris and the church and which from this record appears to have been dated May 20, 1799.

While this record cannot be used to establish that fact, the line referred to, also, substantially corresponds with the line recognized by the Donaldson deed and the present claims of the church. The date of such record entries does not appear, but they would seem to be competent evidence not only to show the character of the claim of the church, some time between 1838 and 1862 under the rule above stated, but the extent of such claim, certainly as against any one claiming under John Ferris after 1818. *Spaulding v. Warren*, 25 *Vt.* 316; *Wigmore on Evidence*, *Vol.* 3, § 1778 (*b*), *p.* 797.

Considering the whole record, our conclusion, therefore, is that the church has had possession of the Stalcup lands now claimed by it, under a claim of absolute ownership, at least, since 1818. It is more than possible that its possession began some years before that period, but there is no adequate evidence to support it.

While the date when the church, or its officers, took possession of the strip of land originally included in the bed of the Old Road to the Rocks does not clearly appear, the record shows that it has continued for a much longer period than twenty years under a claim of ownership by the church. Perhaps we should, also, add

that no claim is made that this strip of land was ever included in the Ferris lands acquired under the Stalcup lease and the subsequent conveyances relating thereto.

In addition to what we have already said, it appears from the affidavits filed that the church has, undoubtedly, been in the open, notorious, adverse, continuous and exclusive possession of the whole of the lot on which its church is located and now in its possession under a claim of absolute ownership and without the recognition of the rights of any one to claim any rents for the same, or for any portion thereof, for a much longer period than twenty years.

According to some of the affidavits filed, the possession of the church of such lands has continued for a period of, at least, seventy years, and the present church building has stood on the southern portion of such lot adjoining the land conveyed by John Ferris to Margaret Donaldson, and which is now owned by the Delaware Trust Company, for the whole of that period of time.

The knowledge of one witness, as to the possession of the lot in question under an absolute claim of right, clear of any rent to any lessor, and the position of the church building thereon, was confined to lesser periods but in no case to less than thirty-five or forty years, and in one case to forty-five years.

It further appears from the affidavit of Stephen E. Hamilton that the church has maintained a wall or fence along the southern boundary of the lot in question for upwards of thirty-five years.

As further evidence of the claim of ownership on the part of the church, it appears that it made a deed in fee simple for a small portion of the lands that were included in the limits of the Stalcup lease to William K. McClees in 1862.

Considering the whole record, our conclusion is that the church has acquired title to the whole of the lands in question by adverse possession and can give a good and marketable fee simple title, both to those lands and to the lands acquired by the Stedham deed.

It, therefore, necessarily follows that the court below was right in decreeing specific performance of the contract of sale, and its decree must be affirmed.