# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OCEAN BALTIMORE, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0043-SEM |
| | ) | |
| CELEBRATION MALL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MASTERS FINAL REPORT

Final Report:  May 12, 2021
Draft Report: April 30, 2021
Date Submitted:  January 5, 2021

Daniel F. McAllister, Larry J. Tarabiocs, TARABICOS GROSSO LLP, New Castle, Delaware; *Counsel for Petitioner.*

Vincent G. Robertson, PARKOWSKI, GUERKE & SWAYZE, P.A., Rehoboth Beach, Delaware; *Counsel for Defendant.*

**MOLINA, M.**

This is a quiet title action regarding the ownership of a strip of land between Café Azafrán and Celebration Mall in Rehoboth Beach. The petitioner (the owner of the café property) argues that its predecessors in interest obtained the strip by way of adverse possession and have used it openly and exclusively for more than 60 years. As an alternative, the petitioner argues for a prescriptive easement. The respondent (the owner of Celebration Mall) disagrees and argues it purchased the entire lot from the Epworth United Methodist Church in 2008 and any use of the strip by its neighbor was permissive and non-exclusive.

After extensive discovery, the parties have cross-moved for summary judgment. The petitioner seeks judgment on both of its claims, while the respondent reasoned that factual issues preclude summary judgment for or against an easement. For the following reasons, I find there are no issues of material fact and recommend that judgment be entered in the petitioner's favor, declaring it the owner of the disputed strip by way of adverse possession. As such, I decline to address the alternatively pled claim for an easement. I also recommend that petitioner's request for shifting of fees be denied but petitioner be allowed costs as the prevailing party. This is my final report.[1]

---

[1] This report makes the same substantive findings and recommendations as my April 30, 2021 draft report, to which no exceptions were filed.

## I.    BACKGROUND[2]

To borrow from counsel, "[l]ike the history of Rehoboth Beach, this dispute starts with a church."[3]   That church is Epworth United Methodist Church (the "Church") and in 1914 it moved its sanctuary onto Lot 20 on Baltimore Avenue in Rehoboth Beach.[4]  Baltimore Avenue runs perpendicular to the Atlantic Ocean and, when facing the ocean, Lot 20 is on the righthand side of the street.[5]  Lot 20 is bordered by Lot 22 to the west (farther from the ocean) and Lot 18 to the east (closer to the ocean).[6]

When the Church moved its congregation, it situated its sanctuary more than 10 feet from the border between Lot 20 and Lot 18.[7]  That was done intentionally to avoid interfering with an easement held by a neighboring homeowner for a 10-foot by 100-foot alley on the eastern side of Lot 20, abutting Lot 18.[8]  But even after that early easement was abandoned, the Church did not expand into that space, choosing

---

[2] The record presented consists of nine (9) affidavits, four (4) deposition transcripts, and numerous exhibits.  *See* Docket Item ("D.I.") 44, 48, 50.  I refer to Petitioner's exhibits from D.I. 48 as "Pet. Ex. #," Respondent's exhibits from D.I. 44 and 50 as "Resp. Ex. A-#," and to the affidavits and depositions provided by both parties by "Last Name Aff./Dep."

[3]  D.I. 43 at 3.  *See also Rehoboth Beach History*, REHOBOTH.COM, https://www.rehoboth.com/community/town-history/34-rehoboth-beach-early-history.html.

[4]  *See* Resp. Ex. A-35; D.I. 43 at 6.

[5]  *See* Pet. Ex. 9.

[6]  *See* Resp. Ex. A-5.

[7]  *See* D.I. 43 at 6.

[8]  *See* Resp. Ex. A-42-45.

instead to grow into Lots 22 and 24, to the west.[9] The location of the early easement was roughly in the same place as the now-paved strip at issue in this litigation (the "Disputed Area").[10]

**A. 1919 through 1974.**

The relocated sanctuary remained on Lot 20 until around 1974, when it was demolished and an educational building was constructed in its place.[11] From the 1920's through demolition, the neighboring Lot 18 was continuously held by the Marine family; first by Mary N. Marine, who took title in 1924, and then inherited by David N. Marine.[12] By sometime in 1925, the Marines had established a garage or shed at the end of the Disputed Area.[13] They also utilized the Disputed Area as a driveway providing them access to the shed and the driveway area was "well worn" by 1931.[14] This early use is depicted in photographs taken by an uninterested party. Otherwise, there is little direct evidence before me regarding the use of the Disputed Area from 1919 through the 1950's.

---

[9] *See* Covington Aff. ¶5.
[10] *See* Pet. Ex. 11, Pet. Ex. 27.
[11] *See* Covington Aff. ¶5.
[12] *See* Pet. Ex. 10.
[13] Pet. Ex. 9.
[14] *Id.* Judge Lee testified that, in the 1960's and 1970's, the driveway area had a makeshift improvement of clam or oyster shells or, perhaps, gravel or stone. Lee Dep. 36:19-37:4. This improvement made the driveway feel firmer but, otherwise, it looked like a lawn. *Id.* at 37:14-38:7, 94:1-9. He was unsure who laid the improvement but believed the owners of Lot 18 maintained the lawn during that time. *Id.* at 37:6-38:7.

4

The earliest witness testimony is from neighbors who moved to the area in 1957. Margaret Susan Downs and W. James Downs, Jr. provided affidavits attesting that they lived on Lot 16 (the eastern neighbor to Lot 18) beginning in 1957.[15] Both attest, based on direct observation, that "[s]ince 1957, to the best of [their] knowledge, the [Disputed Area] has only been used by the owners of [Lot 18]; it was never used by the Church."[16] Ms. Downs continues to reside in Lot 16 and contends the use has never changed; Mr. Downs moved away in 1970.[17]

On the Church side, I have personal recollections from the 1960's and 1970's from Reverend Charles E. Covington, Sr. and William Swain Lee, former Family Court and Superior Court Judge. Reverend Covington served as pastor of the Church from 1961 through June of 1975.[18] He oversaw all the Church's construction projects during that time, including the planning for, and construction of, the educational building in 1973 and 1974.[19] Reverend Covington attests that the easternmost line used for construction on Lot 20 (excluding the Disputed Area) was the "commonly accepted property line" and at no time was he told that the Disputed

---

[15] M. Downs Aff. ¶2-3; W. Downs Aff. ¶3.

[16] M. Downs Aff. ¶8; W. Downs Aff. ¶7 (altering the typed affidavit to read "assumption and direct observation").

[17] *Id.* An affidavit was also submitted from Robert Reed who attests that he has lived in Rehoboth Beach for 67 years and has "never known the Church to use" the Disputed Area. Reed Aff. ¶3, 7.

[18] Covington Aff. ¶3

[19] *Id.* ¶4.

Area was (or used to be) part of the Church's property.[20] Reverend Covington goes on to state he was "surprised" to learn about the current claim of ownership and "to [his] knowledge, . . . during [his] tenure as pastor, [the Disputed Area] was never used by the church for any purpose; it was only utilized by the Marine family."[21] Bolstering this representation, Reverend Covington goes on to explain that from 1961 through June of 1975 "[n]o church vehicle, even for weddings, funerals, or special occasions, was ever parked in [the Disputed Area.]"[22]

Judge Lee has a slightly different recollection. Judge Lee joined the Church in 1966 or 1967 and became their go-to attorney.[23] He was also the Chairman of the Administrative Board during the planning for the construction of the educational building.[24] Judge Lee testified that he never personally witnessed the Church or its members using the Disputed Area.[25] He did, however, recall walking to the back of the Church's property a "couple times" by way of the driveway in the Disputed Area.[26] When planning for construction of the educational building, Judge Lee

---

[20] *Id.*

[21] *Id.* ¶6.

[22] *Id.*

[23] Lee Dep. 64:18-65:6.

[24] *Id.* at 54:17-55:16.

[25] *Id.* at 15:24-16:14. Likewise, Judge Lee confirmed, to his knowledge, the Church never used the Disputed Area for bake sales, parking, or events. *Id.* at 49:14-50:1. But, per Judge Lee, he was under the impression that the Disputed Area was used to service the back of the Church's property. *See, e.g.*, *id.* at 50:2-12.

[26] *Id.* at 72:5-10. Judge Lee also speculates that anyone repairing or servicing the back of the Church did (or would need to) use the Disputed Area to do so. *See id.* at 31:21-33:16, 35:5-13. *See also id.* 70:11-24.

researched the property lines and advised the Church that he believed Lot 18 had used the Disputed Area for an extensive period of time and, as such, had acquired a prescriptive easement.[27] Based, at least in part, on Judge Lee's investigation and advice, the Church decided not to build on the Disputed Area or take other steps to oust the owners of Lot 18 from the Disputed Area.[28] Judge Lee was candid while testifying that his recollection was limited and he pointed to other individuals who may have had a better opportunity to view and understand the situation, including, Reverend Covington.[29]

The parties also provided me with one survey prepared during this period. It was drawn by J. Curtis Fritchman, dated May 14, 1974, and notes that the Disputed Area was occupied by the owners of Lot 18 for more than 20 years.[30] Judge Lee testified that the surveyor was a member of the Church and the survey was prepared

---

[27] *Id.* at 11:13-17, 28:17-20, 29:17-30:16. Judge Lee reasons that, because the owners of Lot 18 did not voice a claim of ownership, they only had a prescriptive easement. *See, id.* at 42:10-16, 46:1-11.

[28] *See id.* at 9:20-10:8.

[29] *Id.* at 6:15-7:14 (explaining "I am very leery of the fact that I am the best evidence in this case and we're relying on a 50-year-old memory" and "I don't know how accurate a 50-year-old memory is. If I was a judge sitting as a trier of fact, I would be very leery of somebody saying, well, I remember 50 years ago"). *See also id.* at 59:4-10 (stating "I'm going to tell you what I remember. . . . I'll tell you it's a 50-year-old memory with no documentation and without consultation with other people."). *Id.* at 51:23-52:21. Judge Lee also explained that Reverend Covington "would have been involved in everything. That's part of his personality." *Id.* at 92:9-11.

[30] Pet. Ex. 11.

for the Church,[31] I presume in connection with the construction of the educational building.

**B. 1974 through 2008.**

The educational building was constructed in the place of the original sanctuary in 1974, leaving the Disputed Area untouched.[32]  In 2008, Celebration Mall, LLC ("Respondent") purchased Lots 20, 22, and 24, as improved, from the Church.[33]  The use of the Disputed Area from 1974 through Respondent's purchase appears to have been largely the same as when the original sanctuary was in place.

As explained above, Ms. Downs continued to live on Lot 16 and attests that the owners and tenants of Lot 18 exclusively used the Disputed Area.[34]  This view is supported by Robert Reed, who purchased Lot 18 through T.S. Ltd. Inc. ("T.S.") in 1979.[35]  Per Mr. Reed, from March 1979 through January 1980, Mr. Reed lived on Lot 18 with his wife and exclusively used the Disputed Area.[36] During that time, the Disputed Area "was never used by the Church."[37]  Mr. Reed, through T.S., conveyed Lot 18 to Harry Bonk in 1980 whose family (through various entities)

---

[31] *See* Lee Dep. 42:17-43:4, 45:9-24.
[32] Covington Aff. ¶4.
[33] Pet. Ex. 1.
[34] M. Downs Aff. ¶3, 8.
[35] Reed Aff. ¶4-5; Resp. Ex. A-16-18 (showing the sale by Mr. Marine's co-guardians).
[36] Reed Aff. ¶5-6.
[37] *Id.* ¶6.

continues to hold the property, now through Ocean Baltimore, LLC ("Petitioner").[38]

Notably, the disclosure/settlement statement from the sale to Mr. Bonk notes the property location as "Lot 18 and Easterly 10 Feet of Lot 20, Baltimore Avenue[.]"[39]

Two Bonk family members confirm that they and their tenants have exclusively used the Disputed Area since 1980.[40] Karla Draper, Mr. Bonk's daughter, attests that from 1980-1985, she owned and operated a bathing suit shop on the first floor of the property on Lot 18 and "[o]nly members of [her] family and [her] customers and delivery vehicles used the disputed area[.]"[41] Ms. Draper contends the Church never used the Disputed Area.[42] Likewise, Shauna Thompson, Ms. Draper's sister and the current managing member of Petitioner, testified that from 1980-1983, she lived in the apartment on Lot 18 and, during that time, no one from the Church used or attempted to use the Disputed Area.[43] Rather, she and her family used the Disputed Area exclusively.[44]

---

[38] Pet. Ex. 1 (showing Lot 18 transferred from T.S. to Harry Bonk then to Alpha Farms, LLC, then to Petitioner). *See also* Thompson Dep. 19:11-20, 29:21-30:17, 31:10-15.

[39] Pet. Ex. 2.

[40] Affiant Karla Draper and deponent Shauna Thompson are the daughters of Harry Bonk. *See* Thompson Dep. 8:19-20, 30:15-17.

[41] Draper Aff. ¶4.

[42] *Id.* ¶5. Ms. Draper further attests that she continued to use the driveway in the Disputed Area "regularly" even after she sold her business. *Id.* ¶6.

[43] Thompson Dep. 31:10-15, 10:18-23, 15:14-16:11, 18:2-6.

[44] *Id.* Ms. Thompson further testified that there was never a need to verbalize or memorialize her family's claim to the Disputed Area, such as via letters to the Church or the posting of signs, and that her family maintained the Disputed Area without assistance from the Church since 1980. *Id.* at 85:19-87:24.

By around 2001, Ms. Thompson took over some management responsibilities for Lot 18 (on behalf of then-owner Alpha Farms, LLC).[45] From 2001-2008, Ms. Thompson was at Lot 18 once a month to inspect it and "quite often" parked at the property when visiting Rehoboth Beach.[46] During her visits, Ms. Thompson never witnessed the Church using the Disputed Area and, to her knowledge, only she and the tenants of Lot 18 used and maintained it.[47] This is supported by the affidavit of Bruce Southard, who rented the property at Lot 18 from 2005-2010, during which time he lived on the property and operated a motorized scooter shop on the first floor.[48] Mr. Southard used the Disputed Area for his parking and business needs but did occasionally allow members of the Church to park in the driveway during Sunday services.[49] Mr. Southard represents parking by members of the Church was always with his express permission and he never witnessed anyone associated with the Church use the driveway without permission.[50]

Recollections are largely the same on the Church side. Reverend Jonathan Baker attests that he served as pastor of the Church from 1982 through 1996.[51] He

---

[45] *Id.* at 21:13-18, 39:13-15.
[46] *Id.* at 38:21-40:1. Ms. Thompson explains that she has a reserved spot at Lot 18 that she can use anytime she visits Rehoboth Beach. *Id.*
[47] *Id.* at 25:6-17, 26:7-24.
[48] Southard Aff. ¶3.
[49] *Id.* ¶4-6.
[50] *Id.* ¶6. Further, Mr. Southard attests that he had to, occasionally, instruct members of the public not to use the Disputed Area, understanding the Disputed Area to be part of his leased interests in Lot 18. *Id.* ¶8.
[51] Baker Aff. ¶3. Reverend Baker returned as paster from 2008 through 2013. *Id.*

also lived across the street in the Church parsonage at 17-19 Baltimore Avenue.[52] Reverend Baker attests that "[d]uring [his] appointment at [the Church], the Church never used the disputed area. [He] does not recall anyone even mentioning to [him] that the church owned the property."[53] Further, Reverend Baker attests that he only witnessed "the various businesses and residents of Lot 18" use the Disputed Area during his time with the Church.[54] Reverend Baker also disclosed that the Church requested permission to use the Disputed Area in the 1980's when they needed to do so to access the back of the Church's property.[55] Similarly, Judge Lee testified that he is still a member of the Church (although he's "kind of grown away from it now") and during his time as a member, he has never personally witnessed the Church or its members using the Disputed Area.[56]

The only potential outlier is Reverend Jack Abel who was the pastor of the Church from 2000 or 2001 through the end of 2007.[57] As a new pastor, Reverend Abel testified that he felt it was his responsibility to understand what property the Church owned and he believed the Church owned the Disputed Area during his time

---

[52] *Id.* ¶4.
[53] *Id.* ¶6.
[54] *Id.* ¶7.
[55] *Id.* ¶8.
[56] Lee Dep. 73:4-74:9, 15:24-16:14.
[57] Abel Dep. 10:16-22, 12:4-14.

at the pulpit.[58]  Reverend Abel further testified that he would, on occasion, park in the Disputed Area and walk on the Disputed Area to access the back of the Church's property.[59]  Reverend Abel candidly admitted, though, that the Church was aware of "ambiguity" regarding the Disputed Area.[60]  Rather than address the "ambiguity," Reverend Abel testified that the Church decided to sell the property, subject to the "ambiguity," which could be dealt with by the new owner.[61]

Emory Buck, a member of the Church, spoke a bit more directly about this "ambiguity" in his affidavit.  Mr. Buck attests that he has been a member of the Church since around 1995, was a member of the Building Committee, and was involved in the variance efforts addressed below.[62]  Per Mr. Buck, Judge Lee advised that the Church had lost the Disputed Area due to adverse possession.[63]  Around 2004, Mr. Buck attests that he met with Reverend Abel and another member of the

---

[58] *Id.* at 161:8-20. Reverend Abel explained that he "operated under the impression that it was the church's property" but he does not know specifically how or why he come to that impression. *Id.* at 28:18-29:9.

[59] *See, e.g.*, *id.* at 26:10-27:16, 126:21-127:6.  Reverend Abel confirmed, however, that the Church never used the Disputed Area for events or other parking needs during his time with the Church.  *Id.* at 70:4-19.

[60] *See, e.g.*, *id.* at 92:19-93:11.

[61] *Id.* at 60:13-17.  This ambiguity is noted in the Agreement for Sale between the Church and Respondent's managing member as follows: "10' Title issue re: Lot 20 to be settled by buyer."  Pet. Ex. 4.  *See also* Abel Dep. 34:24-35:1 (explaining his understanding that the Church "sold the property with ambiguity").

[62] Buck Aff. ¶3,5.

[63] *Id.* ¶7.  Judge Lee does not recall giving this opinion.  Lee Dep. 8:21-10:8. Reverend Abel, likewise, does not recall receiving this opinion but explained he's "not saying that that didn't occur." Abel Dep. 18:5-23.

Church to discuss whether the Church could defeat an adverse possession claim; together they concluded that the Church had never used the Disputed Area and, as such, had lost ownership to Lot 18.[64]

From this period (1974-2008), the parties also provided a letter from the City of Rehoboth Beach then-City Manager, two surveys, and documentation related to the Church's 2005 request for a variance. The letter is dated June 26, 1991, from then-City Manager Gregory Ferrese to the then-owner of Lot 18.[65] The letter provides Mr. Ferrese's understanding that previous owners of Lot 18 received ownership of the Disputed Area through adverse possession.[66] The first survey was prepared by Wingate & Eschenbach, dated November 5, 1979, and depicts the Disputed Area as part of Lot 18.[67] The second survey was by Coast Survey, Inc. dated January 7, 2004, and depicts the Disputed Area as part of Lot 20 but notes the 1974 Fritchman survey.[68]

---

[64] Buck Aff. ¶8-10. Reverend Abel testified that he recalls the term "adverse possession" "enter[ing his] vocabulary in that period of time" but he does not remember them leaving the discussion of the Disputed Area with loss by way of adverse possession "as a fait accompli." Abel Dep. at 19:7-23, 24:20-25:3. Revered Abel clarified, however, that he was "not disputing [Mr. Buck's] recollection" and that he "probably [does not] have a clear memory of these events because they're so long ago[.]" *Id.* at 25:4-13.

[65] Pet. Ex. 18.

[66] *Id.*

[67] Resp. Ex. A-29.

[68] Pet. Ex. 16.

The 2004 survey was completed on behalf of the Church in connection with its variance request.[69]   The Church pursued a variance from the City of Rehoboth Beach Board of Adjustment, seeking to confirm its loss of the Disputed Area to the owners of Lot 18 due to adverse possession.[70]   Through that action, the Church advised that the shed on the Disputed Area was encroaching on Lot 20 and the owner of Lot 18 had been using the Disputed Area "as a driveway to his shed and/or property."[71]   The request was denied, however, because the Church failed to establish hardship or unusual practical difficulties necessary for a variance; the Board noted the "facts surrounding the issue raised are uncertain as the claim by adverse possession is contingent and it is uncertain as to whether and to what extent that claim will ultimately prove to be valid."[72]

### C. 2008 through present.

After Respondent took title of Lots 20, 22, and 24, the status quo remained, and the neighbors went about their business without conflict.  That was until 2018.  Regarding the use of the Disputed Area from 2008 through present, the observations of Ms. Downs, Mr. Reed, and Reverend Baker remain unchanged; per them, Lot 18 owners and tenants continued to use the Disputed Area exclusively.

---

[69] Buck Aff. ¶5.
[70] *See* Pet. Ex. 14.
[71] Pet. Ex. 19.
[72] *Id.*

Mr. Southard also overlapped with the new owner of Lot 20 (Respondent) by a couple of years. From 2008 through 2010, Mr. Southard attests that he used the Disputed Area exclusively for his business and personal needs.[73] Mr. Southard further attests that in 2009 a crane company paid him rent to place a crane in the Disputed Area to service the new owner of Lot 20 (Respondent).[74]

After Mr. Southard left, and since January 2010, Café Azafrán has operated out of Lot 18.[75] The owner of the café, Richard B. Steele, attests that he added a handicapped ramp and stairs, concrete pads, and an outdoor walk-in restaurant cooler, partially within the Disputed Area, in 2010.[76] No one objected to these improvements.[77] More so, since Mr. Steele has been leasing the property, no one has used the Disputed Area, other than his employees and landlord.[78] Mr. Steele attests that no one has requested to use the Disputed Area, nor did he have any problems with the neighboring property owner or tenants until 2018.[79] Sometime that year, dumpsters were "unexpectedly" placed in the Disputed Area by a tenant of Lot 20.[80] Mr. Steele had the dumpsters removed and informed his landlord.[81] Ms.

---

[73] Southard Aff. ¶4-5.
[74] *Id.* ¶7.
[75] Steele Aff. ¶4.
[76] *Id.* ¶3-5.
[77] *Id.* ¶6.
[78] *Id.* ¶7.
[79] *Id.* ¶8-10.
[80] *Id.* ¶10.
[81] *Id.*

Thompson confirmed this story and that she approved and participated in the removal on behalf of Petitioner.[82]

I also have the benefit of testimony from the managing member of Respondent, Ronald Eugene Lankford. Mr. Lankford testified that he had no knowledge of how the Disputed Area was used before he purchased the Church's property in 2008.[83] Mr. Lankford testified that he was approached multiple times by the Church to purchase Lots 20, 22, and 24 and did not do any due diligence before finally conceding and closing the deal.[84] About one week before closing, he was made aware of an issue with the shed in the Disputed Area but he was confident he could work it out and closed anyway.[85]

Per Mr. Lankford, the real issue started with construction by the café and, specifically, with the ramp that was installed in 2010.[86] Mr. Lankford attempted to work with the city and counsel to resolve what he saw as an encroachment on Respondent's property, but those efforts were unsuccessful.[87] Mr. Lankford also

---

[82] Thompson Dep. 41:10-18, 72:14-24. Ms. Thompson also testified that Mr. Lankford "requested permission to use the property to put in an electric panel" sometime in 2009. *Id.* at 41:24-42:6. Mr. Lankford testified, however, that he never asked the owners of Lot 18 for permission to use or access the Disputed Area. Lankford Dep. 41:17-42:2.

[83] Lankford Dep. 15:2-8,

[84] *Id.* at 11:9-13:1, 21:3-8.

[85] *Id.* at 19:1-21:2. Mr. Lankford also signed, on behalf of Respondent, a survey waiver form, confirming that he was made aware that a survey would reveal any encroachments but he, nonetheless, waived it. Pet. Ex. 5.

[86] Lankford Dep. 30:15-31:12.

[87] *Id.* at 30:19-33:7.

testified that he sent maintenance workers to the back of Respondent's property, via the Disputed Area, believing Respondent owned it.[88] But Mr. Lankford confirmed that when his tenants placed trash cans and dumpsters in the Disputed Area, the owners or tenants of Lot 18 had them removed.[89]

I also have a survey from Adams-Kemp Associates, Inc. dated May 20, 2011, which depicts the Disputed Area as part of Lot 18, noting the Disputed Area was claimed by adverse possession.[90] The survey was prepared for Petitioner.[91]

**D. Procedural Posture.**

Petitioner filed a verified petition on January 22, 2019 with two alternative counts: (1) to quiet title to the Disputed Area in its favor due to adverse possession or (2) for confirmation of a prescriptive easement over the Disputed Area.[92] On March 7, 2019, Respondent answered the petition, asserted affirmative defenses, and pled a counterclaim for declaratory relief, ejectment, and fees and expenses.[93] Petitioner answered the counterclaim on March 27, 2019.[94]

---

[88] *See, e.g.*, *id.* at 25:5-26:19.
[89] *Id.* at 49:16-51:10.
[90] Resp. Ex. A-173.
[91] *Id.* *See also* Thompson Dep. 58:8-12.
[92] D.I. 1.
[93] D.I. 8.
[94] D.I. 10.

The parties have engaged in extensive discovery and, since July 9, 2020, have operated under a stipulated status quo order regarding use of the Disputed Area.[95] The parties cross-moved for summary judgment in the fall of 2020, with briefing completed on January 5, 2021.[96] Trial was originally scheduled for April 14-15, 2021, but was cancelled, and, in light of this report, need not be rescheduled.

## II.    ANALYSIS

Under Court of Chancery Rule 56(c), summary judgment will be granted "only where the moving party demonstrates the absence of issues of material fact and that it is entitled to a judgment as a matter of law."[97] "A party opposing summary judgment, however, may not merely deny the factual allegations adduced by the movant. If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavits or proof of similar weight."[98]

Here, with both parties moving for summary judgment on Petitioner's adverse possession claim, I "deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[99] With that stipulation, I draw no inferences in favor of one party or the other. For the reasons

---

[95] *See* D.I. 23, 42, 59.
[96] D.I. 52.
[97] *Wagaman v. Dolan*, 2012 WL 1388847, at *2 (Del. Ch. Apr. 20, 2012).
[98] *Tanzer v. Intern'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979).
[99] *See* Ct. Ch. R. 56(h).

explained herein, I decline to address Petitioner's motion regarding its Count II for a prescriptive easement, which should be dismissed as moot. Petitioner also asks for bad faith fee shifting, alleging improper conduct by Respondent and its counsel. That request is addressed in Section II.C, *infra*.

**A. Judgment should be entered in Petitioner's favor on its Count I.**

Petitioner's Count I is a claim to quiet title due to adverse possession. To succeed on a claim for adverse possession, Petitioner needs to establish by a preponderance of the evidence "(1) open and notorious, (2) hostile and adverse, (3) exclusive, (4) actual possession, (5) that was continuous for twenty years."[100] There is no dispute that Petitioner (and the previous Lot 18 owners) openly and notoriously used the Disputed Area for many years. At issue is whether the use was (1) hostile and exclusive (versus with permission from the Church or its successors) and (2) continuously for more than 20 years.

"A use is adverse or hostile if it is inconsistent with the rights of the owner. Said differently, [h]ostile means against the claim of ownership of all others, including the record owner."[101] And "the exclusivity element does not require absolute exclusivity. Exclusive possession means that the adverse possessor must show exclusive dominion over the land and an appropriation of it to his or her

---

[100] *Tumulty v. Schreppler*, 132 A.3d 4, 24 (Del. Ch. 2015).
[101] *Bogia v. Kleiner*, 2019 WL 3761647, at \*10 (Del. Ch. Aug. 8, 2019) (citations and quotation marks omitted) (alteration in original).

benefit."[102]  Once an adverse-possession claimant meets its burden of proof on all elements, "the burden shifts to the record owner to rebut the adverse possession claim by establishing that the possession was permissive."[103]

First, I address the portion of the Disputed Area on which the shed was built. Evidence submitted with the briefing shows that the shed was built, partially on Lot 20, by 1925 and was constructed solely by the owners of Lot 18.  Constructing and maintaining an improvement is action indicative of ownership and is adverse and hostile.[104]  By 1945, at the latest, the shed still stood, the adverse possession period was met, and that portion of the Disputed Area became the property of Lot 18, to the detriment of Lot 20.[105]

---

[102] *Tumulty*, 132 A.3d at 26 (citations and quotation marks omitted).

[103] *Waples v. Burton*, 2020 WL 3286535, at *2 (Del. Ch. June 18, 2020) (citing *In re Campher*, 1985 WL 21134, at *2 (Del. Ch. Mar. 20, 1985), *aff'd*, 489 A.2d 1090 (Del. 1985)).

[104] Both parties cite to *Marvel v. Barley Mill Rd. Homes*, 104 A.2d 908 (Del. Ch. 1954) and the helpful analogy that a would-be adverse possessor "must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest." *Id.* at 911 (citations omitted).  The shed was an unquestionable flag that has been flying since, at least, 1925.

[105] Respondent appears to argue that the owners of Lot 18 needed to tell the Church or Respondent that they were claiming ownership or make other overt efforts to assert ownership such as by sending a written notice, posting signs, or constructing a fence. Although these actions may have helped Petitioner's case, they are not necessary to succeed, particularly here, where there is a clear, undisputed history of open and notorious use.  *See, e.g., Lewes Tr. Co. v. Grindle*, 170 A.2d 280, 282 (Del. 1961) ("[I]t is not necessary that one entering a property must expressly declare his intention to take and hold the property as his own. The actual entry upon and the use of the premises as if it were his own, to the exclusion of others, is sufficient[.]"). *Cf. Mitchell v. Dorman*, 2004 WL 117580, at *3 (Del. Ch. Jan. 16, 2004) (rejecting a laches argument because an adverse possessor was reasonable in assuming "that her rights in the Disputed Half-Acre were secure, and

The remaining part of the Disputed Area, the now-paved driveway,[106] requires a more detailed inquiry. The evidence suggests that the driveway area was in heavy use in the 1920's and 1930's. But I do not have anything tying that use exclusively to the owners or tenants of Lot 18. That brings me to 1957 when neighbors from Lot 16 were able to view the use and now attest that the driveway area was only used by Lot 18. But I appreciate that these neighbors do not have the most direct vantage point or line of sight into the Disputed Area. Moving up in time, I then have Reverend Covington who attests, from 1961 through 1975, the Church never used the Disputed Area and it was exclusively used by the owners of Lot 18. Reverend Covington had a direct vantage point and, as pastor of the Church, reason to make himself apprised of the nature and scope of the Church's property and work to protect the Church's property interests.

Using Reverend Covington's 1961 start date, the 20-year adverse possession period would have been met by 1981, unless there was an interruption or ouster. The only person who provided equivocal testimony about the use of the Disputed Area during this period was Judge Lee. Specifically, he testified that after 1966 or 1967, he went to the back of the Church a "couple times" and walked along the driveway

there was no reason for her to bring a suit to quiet title or take any other action to assert her rights. In other words, she took all the necessary action to assert her rights merely by continuing to use and maintain the Disputed Half-Acre as if it was her own").

[106] *See* Pet. Ex. 27.

in the Disputed Area to do so. He also believes that repairs or maintenance for the back of the Church's property required use of the Disputed Area and was under the impression that the Disputed Area was used to service the back of the Church's property.

Although I appreciate the logic in Judge Lee's supposition, it is speculative at best. Further, Judge Lee's use of the Disputed Area a "couple times" and belief regarding use by others associated with the Church is not sufficient to overcome the evidence of exclusive and continuous use by the owners of Lot 18.[107] That is particularly true in light of Judge Lee's admission that he never personally witnessed the Church or its members using the Disputed Area and belief that the Disputed Area "had been used prescriptively, adversely, whatever you want to say, without any claim of right," by the owners of Lot 18.[108] Further, the testimony from the owners and tenants of Lot 18 from 1979 through 1981 (the only relevant years covered in the record) confirms Reverend Covington's observations. Petitioner has, therefore, met its burden of proving all elements of adverse possession by a preponderance of

---

[107] Nor do I believe this testimony from Judge Lee creates an issue of material fact. *See Mitchell*, 2004 WL 117580, at *3 (explaining "the disputed fact must be material to the final disposition of the case"). Even if Judge Lee is correct in his understanding and speculation that those associated with the Church occasionally used the Disputed Area to access the back of the Church's property, that occasional, incidental use is not enough to defeat the claim of adverse possession. *See Tumulty*, 132 A.3d at 26 (finding temporary incursions insufficient to "destroy exclusivity").

[108] Lee Dep. 29:17-22.

22

the evidence and Respondent has failed to rebut that showing. By 1981, title to the Disputed Area was gained by the owners of Lot 18 and lost by the record owners.

Respondent tries to pull my focus from this history of use, pointing me to the chain of title for each lot and arguing that the exclusion of the Disputed Area from the chain of title for Lot 18, and continued inclusion in that of Lot 20, somehow vitiates Petitioner's claim.[109] But the lack of record title is the very nature of adverse possession; the owners of Lot 20 remained the record owners, but Lot 18 had adversely possessed the property, gaining legal title by 1981, at the latest.[110] Respondent (and its predecessors) could not defeat the accruing adverse possession by attempts to shore up, or alert the adverse possessor of, its record title—only ouster or attempted ouster before the expiration of the 20-year period would have been sufficient.[111] Rather than take steps to oust the owners and tenants of Lot 18 from

---

[109] Respondent also tries to muddy the waters with talk of taxes. On the current record, it appears the continued payment of taxes by the Church and its predecessors was made with, and notwithstanding, the Church's knowledge of Lot 18's adverse possession. It would be inequitable to allow the Church's successors in interest to use its conduct to disprove or attempt to vitiate the ownership already obtained. And there is no requirement under Delaware law that an adverse possessor pay taxes for the adversely possessed property during or after the adverse possession period to succeed on a claim to quiet title. *See Tumulty*, 132 A.3d at 25 ("[T]here is no suggestion in Delaware case law that either the recording of a deed or the payment of taxes is *necessary* to make out a successful adverse possession claim.") (emphasis in original).

[110] And, I note, the disclosure/settlement statement from the sale to Mr. Bonk notes the property location as "Lot 18 and Easterly 10 Feet of Lot 20, Baltimore Avenue[.]" Pet. Ex. 2.

[111] *Tumulty*, 132 A.3d at 25 (citing *Acierno v. Goldstein*, 2004 WL 1488673, at *6 n.41 (Del. Ch. June 29, 2004)).

23

the Disputed Area, the Church gave up all rights to the Disputed Area and attempted to formalize the "commonly accepted property line" through a variance.[112] Petitioner's predecessors also did not need to include the Disputed Area in subsequent deeds (or leases) related to Lot 18 to retain the title they gained.[113]

Finally, to avoid any confusion, I find testimony regarding entries into or use of the Disputed Area by those associated with Lot 20 after 1981 are immaterial. By 1981, legal title had already been gained by Lot 18 and subsequent, occasional use by those associated with Lot 20 cannot take that title away.[114]

---

[112] During the adverse possession period, the Church simply ignored and failed to take steps to stop the encroachment by Lot 18; that was enough to lose their interests. *See Marvel*, 104 A.2d at 911 ("The owner is, of course, chargeable with knowledge of what is openly done on his land and therefore calculated to attract attention."). The efforts in 2005 to make the adverse possession "official," confirms the Church's relinquishment and appreciation that, by then, the Disputed Area no longer belonged to the Church and was part of Lot 18.

[113] *Tumulty*, 132 A.3d at 25. This is particularly true where subsequent owners and lessees testified consistently that they believed and understood the Disputed Area to be part of their interests in Lot 18. *See Marvel*, 104 A.2d at 913 (explaining "[i]t is generally held that where a person having title by deed to a lot . . . also has [e]nclosed with it and is in possession of adjoining land to which he has no record title and conveys the land by the description in the deed and delivers with it the possession of the entire [e]nclosure, the continuity of possession will not be broken, and the two possessions may be joined and considered as one continuous possession"). *Cf. Mitchell*, 2004 WL 117580, at *3.

[114] *See Marvel*, 104 A.2d at 913 (explaining "[t]he acquirement of title by right of adverse possession . . . creates a new legal title though not a record title and that title would not be lost by a cessation of possession and continued exclusive possession is not necessary to maintain it"). *Cf. Mitchell*, 2004 WL 117580, at *4 (rejecting a laches argument because of the record owners' own lack of diligence and failure to protect their rights after they purchased the property knowing of the dispute, failed to obtain a survey, and permitted the adverse use to continue for years).

Although I start the clock at 1925 and 1961, for the shed portion and driveway portion, respectively, I appreciate "[i]t is more than possible that [Lot 18's] possession began some years before that period, but there is no adequate evidence to support it."[115] The evidence does support, however, open, notorious, hostile, and exclusive use by the owners and tenants of Lot 18 for more than 20 years. I find Petitioner's use of the Disputed Area was sufficient to establish adverse possession and Respondent has not presented any non-speculative evidence of permission or joint use sufficient to rebut Petitioner's showing or raise a material issue of fact. As such, I recommend that summary judgment be granted in Petitioner's favor and against Respondent on Petitioner's Count I.

## B. Petitioner's Count II should be dismissed as moot.

Having found that Petitioner should be granted summary judgment on its first count, I decline to render what may be an advisory recommendation on its alternative request for a prescriptive easement. I recommend, instead, that Count II be dismissed as moot.

## C. Petitioner's request for fee shifting should be denied but costs should be shifted under Court of Chancery Rule 54(d).

Petitioner seeks to shift its attorneys' fees and costs to Respondent arguing that Respondent and his counsel engaged in bad faith conduct before and during this

---

[115] *Del. Land & Dev. Co. v. First & Cent. Presbyterian Church of Wilm., Del., Inc.*, 147 A. 165, 180 (Del. 1929).

litigation. Under the American Rule, "each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[116] One exception is for bad faith conduct.[117] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims."[118] Further, the bad faith exception is only "applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[119] The party seeking fee shifting under the bad faith exception must demonstrate by clear evidence that the other party acted in subjective bad faith.[120]

Petitioner argues that litigation costs were substantially increased because Respondent obtained an allegedly false affidavit from one of the Church's former reverends and failed to timely disclose it during discovery.[121] Although I see some missteps, I fail to find bad faith. Deposition testimony confirms that the affidavit was drafted by Respondent's counsel after a telephonic discussion with the reverend. Such is not unusual or improper. Then the reverend was provided an opportunity to review, correct, and amend the affidavit before execution. Again, an acceptable

---

[116] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017).
[117] *Id.*
[118] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998).
[119] *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).
[120] *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014).
[121] D.I. 48 at 51.

practice. It does, however, appear that the affidavit was not properly notarized, but I find no bad faith evident in that deficiency. Likewise, although the reverend was encouraged to revisit and revise the affidavit, I see no indication that such was done to hide information from Petitioner or the Court and the affidavit was produced before the close of discovery.

Petitioner also seeks fee shifting based on alleged bad faith conduct before this litigation commenced. Petitioner argues:

> Respondent knew full well before purchasing the Church Property that Petitioner had a claim to the Disputed Area based on nearly a century of use, and this was reflected in the purchase price. Nevertheless, Respondent engaged in self-help, forcibly entered the Disputed Area, and placed a dumpster there after Petitioner told one of Respondent's tenants not place trash cans in the Disputed Area.[122]

Although I appreciate Petitioner's frustration and agree Respondent's claim to title was weak, I have carefully reviewed the deposition testimony of Respondent's managing member and find that he was under a real, albeit mistaken and uniformed, belief that Respondent purchased the Disputed Area. Respondent's managing member admitted he did no due diligence and was not familiar with the historical use of the Disputed Area before the purchase. Further, I find no evidence that Respondent's contract reflected a discounted or reduced price specifically due to the loss of the Disputed Area. And, finally, I find Respondent's decision to

---

[122] *Id.* at 57-58.

continue this dispute is much more forgivable than that in *Judge v. City of Rehoboth Beach*, 1994 WL 198700 (Del. Ch. Apr. 29, 1994). In short, I find the conduct at issue insufficient to justify bad faith fee shifting. For these reasons, and under the totality of the circumstances presented, I recommend that fees and expenses not be shifted.

But I do find that Petitioner is entitled to court costs under Court of Chancery Rule 54(d), which provides: "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." I find Petitioner is the prevailing party on its primary claim in this litigation and that its costs should be allowed.

## III. CONCLUSION

For the foregoing reasons, I recommend that judgment be entered in Petitioner's favor on its Count I and its Count II be dismissed as moot. I further recommend that the request for fee shifting be denied but that costs be allowed to Petitioner as the prevailing party. This is my final report and exceptions may be taken under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery